[No. D045824. Fourth Dist., Div. One. Aug. 26, 2005.]

In re DAKOTA H., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
CHRISTINA N., Defendant and Appellant.

COUNSEL

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and Appellant.

John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Alice C. Shotton, under appointment by the Court of Appeal, for Minor.

## OPINION

**HUFFMAN, J.**—Christina N. appeals a judgment terminating her parental rights to her minor son Dakota H. under Welfare and Institutions Code section 366.26.[1] Christina contends her due process rights to maintain her parental status were violated by the lack of a current judicial finding of parental unfitness. Christina also challenges the court's finding there was not a beneficial relationship exception to termination of parental rights under section 366.26, subdivision (c)(1)(A). We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Dakota was born in October 1996. When he was four, his mother, Christina, married Ricky.[2] Their home life was marred by Ricky's temper and substance abuse problems. Dakota was developmentally delayed and physically aggressive. When Dakota was five, he was diagnosed with autism.

After an incident of domestic violence in which Ricky physically abused Dakota, child protective services in South Carolina intervened. The juvenile court allowed Christina to retain custody of Dakota on condition she not allow Dakota to have contact with Ricky. Christina did not comply with the order. The family left South Carolina in late May 2002 after the court issued a restraining order. The court issued bench warrants for Christina and Ricky.

The San Diego County Health and Human Services Agency (Agency) took Dakota into protective custody on July 3, 2002, after Dakota, Christina and Ricky were in a motor vehicle accident. Ricky was arrested for driving under the influence and child endangerment. In August 2002, the juvenile court took jurisdiction of Dakota based on findings Christina inadequately supervised him. Dakota was placed in foster care. Christina's reunification plan required her to attend a weekly domestic violence program, undergo a psychological evaluation, participate in individual psychotherapy and attend classes specifically designed for parents of special needs children. The court gave the Agency the discretion to expand Christina's weekly supervised visitation.

Christina showed a genuine interest in reunification. She consistently visited Dakota. However, she continued to live with Ricky, impeding progress with expanded visitation. After another incident of domestic violence in March 2003, Christina initiated divorce proceedings. She began individual counseling in March 2003 and a domestic violence program in June 2003. After Christina started working, she discontinued individual therapy. She did not attend parenting class.

---

[1] Statutory references are to the Welfare and Institutions Code.

[2] Dakota's alleged father was never part of his life. He could not be located. The court terminated his parental rights on November 22, 2004.

Dakota remained in stable placement in the foster home. He still had outbursts, but in general his behavior improved. Dakota enjoyed his weekly visits with his mother. She was patient, gentle and affectionate with him. He responded well to her warmth. Dakota sometimes said, "I want to go home with mommy" and talked about his visits with her when he returned to the foster home. Christina and Dakota displayed mutual expressions of love, attention and care. The social worker wrote she had "never met a parent more unconditional in her affection or more available to her child."

Dakota and Christina read and played together and went on outings. Christina helped Dakota with his homework. However, Dakota met any form of discipline with hostility. Christina was unable to cope with Dakota's more serious behaviors and relied on the supervising social worker for assistance. Christina was a wonderful playmate and set some boundaries, but she did not appear to encourage Dakota's growth.

By the 12-month review hearing, Christina had not made substantive progress towards reunification due to her delayed participation in recommended programs. The court terminated services and set a permanency hearing under section 366.26 for December 2003. The court kept visitation in place, noting it "obviously should continue."

Due to Dakota's autism and other developmental delays, the Agency assessed him as "difficult to adopt." The adoption social worker determined Dakota was "specifically adoptable" and believed it would be possible to identify a family willing to adopt him. Christina proposed placing Dakota in the home of his maternal uncle in South Carolina. In December 2003, all parties agreed to a three-month continuance of the permanency hearing to allow the Agency to identify a potential adoptive family and conduct an interstate evaluation of the maternal uncle's home.

In March 2004, the Agency identified an adoptive home for Dakota in Michigan. The family had adopted two other special needs children, one diagnosed with autism and the other with mild mental retardation. The prospective adoptive father, J.S., was knowledgeable about autism and actively involved with his sons' education and support programs. The placement was an exceptional opportunity for Dakota. When the Agency interviewed Dakota's uncle, he did not feel capable of caring for Dakota as a primary custodian but was willing to let Christina and Dakota live with him.

The court granted Christina's requests for a bonding study and a continuance of the permanency hearing. Christina filed a petition under section 388, asking the court to vacate the section 366.26 hearing and place Dakota with her in South Carolina under the supervision of his uncle. In May 2004, the

court continued the section 388 and section 366.26 hearings for another two months to allow time for a review of the bonding study, an evaluation of Dakota by a specialist in childhood autism, and to meet scheduling requirements of witnesses. All parties stipulated the court could consider evidence presented at the section 388 hearing for its determination under section 366.26.

Clinical psychologist Beatriz Heller, Ph.D., found that "[w]ithin the confines of the difficulties in interpersonal relationships that this boy presents, Dakota seems to have a significant attachment to his mother." When Dakota entered Dr. Heller's office, he immediately stated, "I want my mommy." When he saw Christina, he "joyfully exclaimed, 'Mommy!'" She observed Christina "act in a comforting, nurturing, soothing, and stimulating manner to her son." Dakota responded to her "by curbing disorganized activities, stopping perseverative behavior, or becoming engaged in different pursuits."

Cynthia Norall, Ph.D., a psychologist specializing in the delivery of support services to autistic children, evaluated Dakota's needs and attachments within the context of his disability. Dakota did not maliciously intend to hurt people but he did not know how to interact or communicate. His attention issues were a result of high-functioning autism rather than attention deficit hyperactivity disorder. Despite his difficulties, Dakota was a "happy and friendly little guy who seems to enjoy being with others."

Dr. Norall believed Dakota would make the transition to an adoptive home with little disruption. Due to the nature of autism, she questioned the degree and quality of Dakota's attachment to Christina. Dakota could attach to another caregiver if the environment were very structured and if the caregiver could clearly communicate what was expected. Dr. Norall did not believe adoption would be emotionally detrimental for Dakota.

Dakota needed a caregiver with access to specialized services to give him the strategies necessary to develop appropriate social skills. These strategies would make the difference in Dakota's ability to function as an independent adult. The caregiver required the capability when Dakota was disruptive to mediate and facilitate his social abilities and replacement behaviors. Dakota's caregiver had to be able to establish a regular routine and at the same time expose Dakota to a variety of experience. Dr. Norall did not believe Christina would be able to meet Dakota's needs.

The home study and evaluation of the prospective adoptive family was completed in August 2004. Christina consented to Dakota's placement in Michigan. She had become homeless and needed to return to her family in South Carolina. The court maintained the visitation order and made arrangements for Christina to be able to telephone Dakota.

By October 2004, Christina was living with her brother and wanted Dakota to join her. She told the court she had resources available to address Dakota's developmental needs. The court found that Christina did not prove a substantial change in circumstances and denied her section 388 petition. The court requested more information concerning the proposed adoptive placement before deciding Dakota's permanent plan.

Dakota adjusted well to his new home. Initially, he displayed some aggressive behavior. J.S.'s disciplinary measures were calm and effective. His partner of 20 years took an active role in parenting. Dakota was affectionate with his new family and appeared to enjoy his interactions with the other boys. J.S. was adept at gaining services for his children. He arranged comprehensive health care evaluations for Dakota. Dakota's doctor reduced his medication. As a result, Dakota was more alert and better able to relay information. He was "doing great" in school. Dakota appeared happy and comfortable in the home.

The court found by clear and convincing evidence that none of the exceptions of section 366.26, subdivision (c)(1) applied to preclude the termination of Christina's parental rights. The court further found adoption to be in Dakota's best interests, terminated parental rights and referred Dakota for adoptive placement.

DISCUSSION

I

*PROCEDURAL CHALLENGE TO THE COURT'S*
*JUDGMENT*

Christina asserts her due process right to a continued parental relationship with Dakota was violated by the lack of a current judicial finding of parental unfitness. She argues the 15-month delay from the 12-month review hearing to termination of parental rights rendered stale the finding that return of Dakota to Christina would create a substantial risk of detriment. (See § 366.21, subd. (f).) We disagree.

A

*The Doctrine of Forfeiture*

■ A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. (Civ.

Code, §§ 3515, 3516; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 390, 391, pp. 440–442; *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885 [48 Cal.Rptr.2d 763]; see *In re Dakota S.* (2000) 85 Cal.App.4th 494, 501–502 [102 Cal.Rptr.2d 196].) Forfeiture, also referred to as "waiver," applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings. (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1037–1038 [113 Cal.Rptr.2d 597]; *Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1149 [96 Cal.Rptr.2d 104]; *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1152 [94 Cal.Rptr.2d 693]; see *In re Riva M.* (1991) 235 Cal.App.3d 403, 411–412 [286 Cal.Rptr. 592].)

Christina failed to bring to the court's attention her assertion that principles of due process required the court to make a new finding of parental unfitness before proceeding to a permanency hearing. Had she done so, the court could have considered her claim and, if it found her due process argument meritorious, determined and applied the appropriate legal standard. A party may not assert theories on appeal which were not raised in the trial court. (*Fretland v. County of Humboldt* (1999) 69 Cal.App.4th 1478, 1489 [82 Cal.Rptr.2d 359].) Christina forfeited the right to assign error on appeal.

Christina asserts she may raise a new theory on appeal because the facts on which she bases her claim are not subject to dispute. (*Dieckmeyer v. Redevelopment Agency of City of Huntington Beach* (2005) 127 Cal.App.4th 248, 259 [24 Cal.Rptr.3d 895]; *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847 [60 Cal.Rptr.2d 780]; see *Panopulos v. Maderis* (1956) 47 Cal.2d 337, 341 [303 P.2d 738].) Even if the doctrine of forfeiture did not apply, we would reject Christina's claim she had a due process right to a continued relationship with her son absent a new finding of parental unfitness. Because the question is one of law, we review the claimed constitutional violation de novo.

B

*The Process That Is Due*

"It is axiomatic that due process guarantees apply to dependency proceedings." (*Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 756 [89 Cal.Rptr.2d 407], citing *Stanley v. Illinois* (1972) 405 U.S. 645, 658 [31 L.Ed.2d 551, 92 S.Ct. 1208]; *Santosky v. Kramer* (1982) 455 U.S. 745, 753–754 [71 L.Ed.2d 599, 102 S.Ct. 1388].) The United States Supreme Court recognizes the concept of "due process" cannot be precisely defined. (*Lassiter v. Department of Social Services* (1981) 452 U.S. 18, 24 [68 L.Ed.2d 640, 101 S.Ct. 2153].) In deciding requirements of due process, the court evaluates three elements: the private interests at stake, the

government's interest, and the risk the procedures used will lead to an erroneous decision. (*Lassiter, supra,* 452 U.S. at p. 27, citing *Mathews v. Eldridge* (1976) 424 U.S. 319, 335 [47 L.Ed.2d 18, 96 S.Ct. 893]; see also *Santosky v. Kramer, supra,* 455 U.S. at pp. 753–757.)

█ The private interest at stake in a dependency proceeding is enormous. A parent's interest in the companionship, care, custody and management of his or her children is a fundamental civil right. (*In re B.G.* (1974) 11 Cal.3d 679, 688 [114 Cal.Rptr. 444, 523 P.2d 244].) Children, too, have a compelling independent interest in belonging to their natural family. (*Adoption of Kay C.* (1991) 228 Cal.App.3d 741, 749 [278 Cal.Rptr. 907].) In addition, each child has a compelling interest to live free from abuse and neglect in a stable, permanent placement with an emotionally committed caregiver. (*In re David B.* (1979) 91 Cal.App.3d 184, 192–193 [154 Cal.Rptr. 63].) The governmental interest in a child's welfare is significant. "[T]he welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [19 Cal.Rptr.2d 544, 851 P.2d 826], citing *In re David B., supra,* 91 Cal.App.3d at pp. 192–193 and *Stanley v. Illinois, supra,* 405 U.S. at p. 649 [31 L.Ed.2d 551, 92 S.Ct. 1208].)

█ In dependency proceedings, unless limited exceptions apply, a parent is provided with services designed to reunify the family within a statutory time period. (§ 361.5; see 42 U.S.C. § 629 et seq.) The burden remains on the state to show return of the child to the parental home would create a substantial risk of detriment to the child. (§§ 366.21, subd. (f), 366.22, subd. (a).) If, after the state has made reasonable reunification efforts, the court finds there is not a substantial probability the child safely can be returned home, the court terminates reunification services and sets a permanency hearing under section 366.26. (§§ 366.21, subd. (g), 366.22, subd. (a).) Once family reunification is no longer the primary goal, the state interest requires the court to focus on the child's placement and well-being, rather than on the parent's challenge to custody. (*In re Marilyn H., supra,* 5 Cal.4th at p. 307.) The focus of dependency proceedings shifts from the parents' interest in reunification to the child's interest in permanency and stability. (*Id.* at p. 309.) By the time a permanency hearing has been set, the child's private interest in a safe, permanent placement outweighs the parent's interest in preserving a tenuous relationship with the child. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535].)

■ The third element of the due process analysis, the risk of erroneously terminating parental rights, is lessened by the juvenile court's prior findings and procedures. "A finding . . . under Section 366.21 or 366.22, that the court has continued to remove the child from the custody of the parent . . . and has terminated reunification services, shall constitute a sufficient basis for termination of parental rights . . . ." (§ 366.26, subd. (c).) The California Supreme Court held that section 366.26 met due process requirements because the "precise and demanding substantive and procedural requirements the petitioning agency must have satisfied before it can propose termination are carefully calculated to constrain judicial discretion, diminish the risk of erroneous findings of parental inadequacy and detriment to the child, and otherwise protect the legitimate interests of the parents." (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 256 [19 Cal.Rptr.2d 698, 851 P.2d 1307] (*Cynthia D.*).)

The risk of erroneous termination of parental rights is also reduced by the parent's opportunity to be heard on the issue of reunification prior to the permanency hearing. (*In re Marilyn H.*, *supra*, 5 Cal.4th at pp. 309–310; see § 388.) The court's previous finding of detriment to the child if returned home is rebuttable. The burden of proof shifts to the parent. (*In re Marilyn H.*, *supra*, at p. 310.) A parent's ability to file a section 388 petition provides an "escape mechanism" that lessens the risk of an erroneous deprivation of the parent-child relationship in the event of a legitimate change in circumstance. (*In re Marilyn H.*, *supra*, at p. 310.)

Christina contends the risk of erroneous termination of parental rights rises to the level of a due process violation unless the court considers the current ability of a parent to safely care for the child. Christina further argues that a hearing held under section 388 insufficiently protects her rights because the burden of proof shifts to the parent to prove changed circumstances and away from the state to prove the parent unfit.[3]

Christina argues the *Cynthia D.* court upheld the constitutionality of the statutory scheme, specifically the permanency hearing, because it was based on the assumption the court would hear the matter "within 120 days of the

---

[3] The standard Christina adopts, "parental unfitness," was dropped by the Legislature in 1969 in favor of the requirement the court make a finding an award of custody to the parent would be " ' "detrimental to the child." ' " (*In re Cody W.* (1994) 31 Cal.App.4th 221, 225 [36 Cal.Rptr.2d 848], citing *In re B.G.*, *supra*, 11 Cal.3d at pp. 694–695 and *In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514].) The California Supreme Court held the finding of detriment was "the equivalent of a finding of unfitness" with respect to the child involved. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 423 [33 Cal.Rptr.2d 85, 878 P.2d 1297]; see *Cynthia D.*, *supra*, 5 Cal.4th at p. 253; see also *In re Cody W.*, *supra*, 31 Cal.App.4th at p. 225.) For purposes here, we treat the phrases as substantially the same, although the term "parental unfitness" suggests an all-or-nothing approach that does not take in the unique circumstances of each parent-child relationship. (*In re Cody W.*, *supra*, at pp. 225–226.)

hearing from which it was set." (*Cynthia D., supra,* 5 Cal.4th at p. 249; see §§ 361.5, subd. (f), 366.21, subds. (e), (g), 366.22, subd. (a).) She contends this scheme provides fairness to the parties because "the factual basis for the finding of unfitness is fresh, assuring that the decision to terminate parental rights includes a consideration of present circumstances."

■ We do not agree that the Legislature intended the 120-day period for setting a permanency hearing to be strictly applied in all circumstances. The Legislature has expressly authorized a continuance of the hearing beyond the 120 days when required to locate an adoptive home. (§ 366.26, subd. (c)(3).) The maximum time for such a continuance is 180 days. (§ 366.26, subd. (b)(2).) Here, in December 2003, the court granted a 90-day continuance of the permanency hearing in order to identify a home for Dakota.

■ Christina also argues section 366.3 supports her position that the status of the child must be reviewed by the court at least every six months prior to the permanency hearing to ensure that termination of parental rights is based on a current finding of parental unfitness. Section 366.3 generally governs postpermanency-hearing reviews. The requirement the court conduct review hearings every six months does not apply unless the permanency hearing is concluded. (§ 366.3, subd. (d).) The court's consideration of alternative placements, including return to the parental home, adoption, or guardianship, occurs only when a child is placed in long-term foster care. (§ 366.3, subd. (g).)

The circumstances of this case are governed by the provision of section 366.3, subdivision (d), which states in part: "The review of the status of a child for whom the court has not ordered parental rights terminated and who has not been ordered placed for adoption may be conducted by the court or an appropriate local agency. The court shall conduct the review under the following circumstances: [¶] (1) Upon the request of the child's parents . . . . [¶] . . . [¶] (4) It has been 12 months since a review was conducted by the court."

■ Under these circumstances, the Legislature does not require review of the child's status every six months. Where the Legislature makes express statutory distinctions, " 'we must presume it did so deliberately, giving effect to the distinctions, unless the whole scheme reveals the distinction is unintended. This concept merely restates another statutory construction canon: we presume the Legislature intended everything in a statutory scheme, and we should not read statutes to omit expressed language or include omitted

language.' " (*People v. Connor* (2004) 115 Cal.App.4th 669, 691 [9 Cal.Rptr.3d 521], quoting *Jurcoane v. Superior Court* (2001) 93 Cal.App.4th 886, 894 [113 Cal.Rptr.2d 483]; accord, *Yao v. Superior Court* (2002) 104 Cal.App.4th 327, 333 [127 Cal.Rptr.2d 912].) A parent is not entitled to a judicial review hearing under this provision of section 366.3, subdivision (d), unless he or she requests it, which Christina did not do.

■ Even had Christina requested a review hearing under section 366.3, subdivision (e), the burden and standard of proof on the parent in a proceeding under this section is the same as under section 388. Contrary to Christina's assertion, the court is not required to make a new finding of parental unfitness. The court reviews the "status of the child." (§ 366.3, subd. (d).) Once the court determines the child cannot be returned to the parental home, the burden shifts to the parent to prove changed circumstances. (See § 388.) The Legislature, in enacting section 366.3, explicitly recognized this presumption. (§ 366.3, subd. (e) ["It shall be presumed that continued care is in the best interests of the child, unless the parent . . . prove[s] . . . further efforts at reunification are the best alternative for the child."].) The mere passage of time does not shift the burden of proof back to the state.

Christina had two opportunities to litigate her role as a parent. Had she prevailed on her section 388 petition, Dakota would have been returned to her care. Had she prevailed on the beneficial parent-child relationship exception, her parental rights would not have been terminated. Christina was afforded due process protections after the state proved it would be detrimental to return Dakota to her custody under section 366.21, subdivision (f). (See *Cynthia D., supra,* 5 Cal.4th at p. 256.) She had the opportunity to be heard on the issue of reunification prior to termination of parental rights. (See *In re Marilyn H., supra,* 5 Cal.4th at p. 310.) She had the opportunity to rebut the presumption Dakota's return to her care was detrimental. (*Ibid.*) The court considered her current circumstances before proceeding to the permanency hearing. Therefore, Christina's due process right to avoid termination of parental rights in the event she could show she could appropriately care for her son was not violated.

Even if the state were required by due process considerations to make a new finding of parental unfitness, Christina cannot show she was prejudiced by the extended proceedings. Any error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

Christina benefited from the prolonged proceedings. She had additional opportunity to continue her regular visitation with Dakota and to try to stabilize her situation. In December 2003, Christina proposed placing Dakota in the home of his maternal uncle in South Carolina. All parties agreed to a three-month continuance of the permanency hearing to allow the Agency to identify a potential adoptive family and to conduct an interstate evaluation of the maternal uncle's home. At Christina's request, in March 2004, the court again delayed the proceedings for what turned out to be a highly favorable bonding study. The court granted Christina's motion for a hearing on a section 388 petition. At the close of the section 388 hearing, the court continued the permanency hearing for several weeks in order to carefully review the home study of the prospective adoptive home. At every step, the court conducted the proceedings with utmost respect and care for the fundamental interests at stake.

During the 28 months Dakota was in foster care, Christina did not develop the skills necessary to effectively parent him. She did not attend parenting classes for special needs children, either within the reunification period or on her own initiative in the year following termination of reunification services. Christina did not complete a domestic violence program and stopped going to counseling. She was not able to maintain a stable home and became homeless.

After reunification services were terminated due to her failure to make substantive progress with her case plan, Christina had time to seek services on her own. She did not do so. In October 2004, 27 months after Dakota was removed from her care, she told the court she had resources available to address his developmental needs. Christina did not demonstrate she had learned to meet Dakota's needs or would be able to follow through with available resources.

We are satisfied the court provided Christina a full opportunity to be heard and properly considered her interests and current circumstances. She cannot show prejudice from the delayed proceedings. Error, if any, was harmless.

II

*SUBSTANTIVE CHALLENGE TO THE COURT'S JUDGMENT*

Christina challenges the sufficiency of the evidence to support the court's finding the beneficial parent-child relationship exception under section 366.26, subdivision (c)(1)(A) did not apply to preclude termination of

parental rights. She contends severing the close bond between herself and Dakota would be detrimental to Dakota, who would benefit from continuing the parental relationship.

## A

### The Standard of Review

We review the trial court's findings for substantial evidence. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. (*Id.* at p. 576.) The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631 [85 Cal.Rptr.2d 386].)

Substantial evidence must be of ponderable legal significance. It is not synonymous with "any" evidence. (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651 [51 Cal.Rptr.2d 907].) The evidence must be reasonable in nature, credible, and of solid value. (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336 [95 Cal.Rptr.2d 16].) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947 [124 Cal.Rptr.2d 688], citing *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420 [159 Cal.Rptr. 460].)

## B

### The Beneficial Parent-child Relationship Exception

The purpose of the California dependency system is to protect children from harm and preserve families when safe for the child. (§ 300.2.) If reunification is not possible within the statutory timeframe, the child must be provided a stable, permanent home by adoption, guardianship or placement in long-term foster care. (§§ 366.21, 366.22, 366.26.) Adoption is the permanent plan preferred by the Legislature. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 574.) If reunification efforts have failed and the child is adoptable, the court must select adoption unless it finds terminating parental rights would be detrimental to the child under at least one of five statutory exceptions. (§ 366.26, subd. (c)(1)(A)–(E); see also *In re Erik P.* (2002) 104 Cal.App.4th 395, 401 [127 Cal.Rptr.2d 922]; *In re Derek W.* (1999) 73 Cal.App.4th 823, 826 [86 Cal.Rptr.2d 739].)

 Section 366.26, subdivision (c)(1)(A), provides an exception to termination when "[t]he parents . . . have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." We recognize that interaction between parent and child will always confer some incidental benefit to the child. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) To meet the burden of proof, the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits. (*In re Derek W., supra,* 73 Cal.App.4th at p. 827.) The parent must demonstrate more than incidental benefit to the child. In order to overcome the statutory preference for adoption, the parent must prove he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment of the child to the parent. (*Ibid.; In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324 [60 Cal.Rptr.2d 557].)

When determining whether the exception applies to bar termination of parental rights, the court balances the strength and quality of the parent-child relationship in a tenuous placement against the security and sense of belonging that a stable family would confer on the child. However, if severing the existing parental relationship would deprive the child of "a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) In other words, if an adoptable child will not suffer great detriment by terminating parental rights, the court must select adoption as the permanency plan. (See § 366.26, subd. (c)(1).)

C

*The Parent-child Relationship Did Not Outweigh Dakota's Exceptional Needs*

We agree with Christina that she had a loving parental relationship with Dakota for many years. However, substantial evidence supports the court's finding the benefit of continuing that relationship did not outweigh Dakota's exceptional needs for a stable home and highly competent caregiver. We agree with minor's appellate counsel that Dakota's autism and lack of emotional attachment to people makes the beneficial relationship exception at issue difficult. However, we are convinced that the trial court properly and carefully assessed Dakota's best interests within the context of his special needs.

The record belies the Agency's assertion Christina did not have a parent-child relationship with Dakota. She parented him for almost six years of his life. She comforted and nurtured him. Dakota responded to her with expressions of love, attention and care. He was happy and excited to see her. There is no doubt Christina maintained regular and consistent visitation with Dakota and he benefited from their relationship.

Nevertheless, Dakota's long-term needs for stability, predictability and highly competent care are of paramount importance. While it is likely Dakota would continue to derive some benefit from continued visitation with Christina, a nonpermanent placement will not meet his long-term needs. Dakota requires a highly competent caregiver. For example, the foster home Dakota lived in for over two years, although stable and loving, was not considered an adequate long-term placement due to his special needs.

Even though Dr. Heller detailed substantial evidence of the strong bond between Christina and Dakota, the court acted within its discretion when it relied on the opinion of Dr. Norall and other witnesses and terminated Christina's parental rights. A judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence. (*Howard v. Owens Corning, supra*, 72 Cal.App.4th at p. 631.)

Dr. Norall concluded that adoption (and termination of parental rights) would not be emotionally detrimental for Dakota. Dakota had the capacity to develop relationships but attached more to objects or to routines than he did to individuals. Dr. Norall did not believe Dakota's attachment to Christina was qualitatively different from his attachment to the foster mother.

Although the stability and security of a permanent home are the most important considerations for Dakota, other factors play a role in balancing his best interests. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1349–1350 [93 Cal.Rptr.2d 644], citing *In re Zachary G.* (1999) 77 Cal.App.4th 799, 811 [92 Cal.Rptr.2d 20].)

The prospective adoptive father, J.S., understood the emotional responses and nonverbal cues that need to be taught to an autistic child. He helped develop and implement special programs for autistic children. J.S. sought out services for Dakota, including opportunities for Dakota to have contact with typically developing peers, an important component of his social development. Dr. Norall told the court the prospective adoptive home was a remarkable opportunity for Dakota and would provide him an extraordinary educational benefit.

Clinical psychologist Richard Owen, Ph.D., concluded that Christina's low-average level of cognitive functioning made her "vulnerable to misunderstanding her [child]'s needs, behaviors and emotions, especially when considering the enormous and special needs of an autistic child." Dr. Owen was concerned Christina's social isolation would impede her access to outside resources for Dakota. During the lengthy dependency proceedings, Christina did not enhance her understanding of autism or of Dakota's special needs. She did not consistently set boundaries, vary his routine or teach him to see things from other people's perspectives, all important and necessary lessons for his social and emotional development.

We cannot ignore who Dakota is and what his needs are. His bond with Christina may be strong, but his needs are exceptional. The strength and quality of Dakota's relationship with Christina must be evaluated in light of any emotional harm to Dakota caused by its severance, his autism, his special needs, and the availability of an exceptional adoptive placement. No one factor controls the court's analysis. It is a balancing test. (See *In re L.Y.L.*, *supra*, 101 Cal.App.4th at 953; *In re Jasmine D., supra,* 78 Cal.App.4th at pp. 1349–1350; *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534 [84 Cal.Rptr.2d 505]; *In re Derek W., supra,* 73 Cal.App.4th at p. 827; *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1109 [89 Cal.Rptr.2d 664]; *In re Zachary G., supra,* 77 Cal.App.4th at p. 811; *In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) Christina ignores this test when she asserts Dakota's constitutional interest in their bonded relationship trumps his other needs, including those for permanency, consistency, structure and insightful parenting.

 Unlike adoption, other permanency options are not equivalent to the security of a permanent home. (*Jones T. v. Superior Court* (1989) 215 Cal.App.3d 240, 251 [264 Cal.Rptr. 4].) Even guardianship is "not irrevocable and thus falls short of the secure and permanent placement intended by the Legislature." (*Ibid.*) The court acted within its discretion when it found Dakota's need for a safe, stable, and permanent home outweighed the benefit he would derive from a continued relationship with Christina.[4]

 Substantial evidence supports the court's finding Dakota would not be greatly harmed if the bonds he and Christina shared were severed. "When the benefits from a stable and permanent home provided by adoption outweigh the benefits from a continued parent[-]child relationship, the court should order adoption." (*In re Zachary G., supra,* 77 Cal.App.4th at p. 811.) The court properly found terminating Christina's parental rights and ordering a permanent plan of adoption were in Dakota's best interests.

---

[4] Minor's counsel informs us there is no reason to believe the adoptive father would not be open to contact between Christina and Dakota.

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and McDonald, J., concurred.