Filed 10/28/20  In re R.P. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re R.P., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, <br><br>     Plaintiff and Respondent, <br><br>       v. <br><br> ANAMARIE P., <br><br>     Defendant and Appellant. | G059151 <br><br> (Super.Ct. No. 19DP0937) <br><br> O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Dennis J. Keough, Judge.  Affirmed.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*        \*        \*

R.P. (the minor) was born in early August 2019, and was taken away from A.P. (mother) at birth after they both tested positive for methamphetamine. Mother then failed to engage in the services offered by Orange County Social Services Agency (SSA) and missed the majority of her scheduled visits with the minor. At the disposition hearing on October 23, 2019, the juvenile court denied reunification services, granted mother seven hours of weekly visitation, and set a hearing under Welfare and Institutions Code section 366.26.[1] On the day of the disposition hearing, mother was arrested and taken into custody for the next six months. At the section 366.26 hearing in June 2020, which occurred after mother had been released from custody, the court terminated mother's parental rights and found the minor to be adoptable.

On appeal, mother contends her due process rights were violated because SSA failed to ensure that she received visitation after she was taken into custody and because the juvenile court failed to ensure that its visitation order was followed. We disagree. Mother never made any complaint to the court regarding lack of visitation after she was taken into custody, nor did she request any specific visitation orders. It was her burden to do so, and the court cannot be faulted for not doing something that was never requested. Further, by the end of February 2020, the minor suffered from respiratory issues that prevented visitation from occurring. For these reasons, we affirm the court's order.

I

FACTS

*A. Petition and Detention*

Mother gave birth to the minor in early August 2019, and both mother and the minor tested positive for amphetamines and methamphetamine. The next day, SSA

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

interviewed mother. It learned she had failed to obtain prenatal care after learning she was pregnant even though hospital staff had advised her to do so. She further admitted to using methamphetamine two months prior to delivery, when she knew she was pregnant. She also self-reported a charge for drug sales in 2016 and active informal probation that she was scheduled to complete in 2020. She also stated that there had been an open dependency case as to her other children as a result of her drug use.

Additional investigation into mother's past revealed she had been arrested several times for drug-related offenses between 2011 and 2018. It also found that mother has children with two other men, Alex V. and Roberto S. (mother and Roberto S. are legally married but have been separated for several years).[2] The other children were removed from mother's care in March 2012 after mother gave birth to the minor's half-sister, and both mother and daughter subsequently tested positive for methamphetamine. Mother reunified with her children and dependent child proceedings were terminated in April 2014. At the time of the minor's birth, all of mother's children (including the child of mother and Alex V.) were in the custody of Roberto S., who had obtained a domestic violence restraining order in 2017 against mother that protected him and all of mother's children. The restraining order was set to expire on September 4, 2020. SSA also found prior child abuse investigations relating to mother and her other children. Some were unfounded while others were substantiated. But no dependency proceedings were initiated based on those investigations.

SSA applied for a protective custody warrant for the minor the day after his birth, and it was granted that same day. On August 6, 2019, SSA filed a juvenile dependency petition based on the above findings. A detention hearing was held on August 7, 2019. Mother was present at the hearing and represented by counsel. The juvenile court found a prima facie case had been established and that the minor needed to

---

[2] The minor's alleged father was never located.

be removed from his parents' physical custody for his own well-being. The minor was placed in a foster home, and the court authorized seven hours of supervised visitation for mother so long as she was "not under the influence of any intoxicants."

*B. Jurisdiction and Disposition Hearings*

Various services were offered to mother, including, among other things, drug testing, parenting classes, and counseling. Mother was also provided multiple bus passes to assist with transportation needs. Mother failed to take advantage of the services. With regard to drug testing, between August 16 to August 28, 2019, mother missed three random drug tests and her call-in compliance was 26 percent. From August 30 to September 19, 2019, mother's call-in compliance was 0 percent and she missed six random drug tests. From September 23 to October 4, 2019, mother missed five random drug tests and had a 0 percent call-in compliance.

Mother also delayed in starting her parenting classes. She eventually made it to her initial parenting class on September 25, 2019, but only stayed for one hour of the two-hour class.[3] Mother also missed her initial intake appointments for counseling services and failed to provide proof of participation in any substance abuse programs or attendance at any self-help meetings.

Similarly, mother was sporadic with visitation, which was divided into two 3-and-a-half-hour visits per week. Mother had a full three-and-a-half-hour visit with the minor on August 13, 2019. But she did not show up for a scheduled visit the next day, claiming she had transportation issues. On August 19 and 21, mother cut her visits with the minor short, leaving after only one hour. She then missed a scheduled visit on August 23 because she was not feeling well. Mother attended visits with the minor on September 3 and September 11, but missed a scheduled visit on September 5.

---

[3] Mother claimed to have stayed for an hour, but a therapist where the class was held stated that mother only stayed for 30 minutes.

On September 17, mother arrived for her visit 10 minutes late and then left 30 minutes early. She appeared jittery and nervous during the visit and fell asleep while carrying the minor. She visited again on September 18, but left after one hour. Mother missed another confirmed visit on September 23. She then missed visits on October 1, 3, 9, 10, and 15, because she failed to confirm the visits ahead of time.

On October 4 and 7, case social worker Maricruz Jimenez attempted to call mother to schedule a face-to-face meeting. Both times mother's phone went straight to voicemail, and the inbox was full so no message could be left. On October 8 and 9, Jimenez attempted to contact mother regarding visitation, but her phone again went straight to voicemail and the mailbox was still full. On October 9, Jimenez sent a text message reminding mother to confirm her visit. Mother never confirmed and the visit was cancelled. Finally, on October 15, 2019, Jimenez attempted to call mother regarding visitation, but her phone was off. So, Jimenez sent mother a text message stating that visitation would be placed on hold until mother called to arrange a visitation schedule. Jimenez then called the minor's maternal grandmother (maternal grandmother), asking her to tell mother to contact Jimenez to arrange visits.

Mother was not present at the jurisdiction hearing on September 25, 2019, and her counsel's request for a continuance was denied. The juvenile court found the petition to be true and set a disposition hearing for October 23, 2019. Mother also failed to appear at the October 23 disposition hearing, and the court again denied her counsel's request for a continuance. The court declared the minor to be a dependent of the court. It denied mother reunification services but approved seven hours of supervised visits per week, with "SSA authorized to liberalize visits as to frequency, duration and need for monitoring . . . ." A section 366.26 hearing was set for February 20, 2020.

*C. Mother's Arrest and Release*

Mother was arrested on October 23, the date of the disposition hearing. She received notice of the section 366.26 hearing while in custody. A new social worker, Thuann Sexton-Hogan was assigned to the minor's case on November 4, 2019.[4] Hogan did not learn that mother had been arrested and was in custody until November 21, 2019, when she was informed by maternal grandmother. Hogan also never informed mother that she had been assigned to the case.

SSA's report filed prior to the hearing on February 20, 2020, stated that the minor had not had contact with mother since dependency. It also stated that the minor had been placed with caretakers who desired adoption, and that there were no impediments to adoption. The report recommended that the minor remain a dependent of the juvenile court, that parental rights be terminated, and that the minor be referred for adoptive placement.

At the February 20, 2020 hearing, the juvenile court learned that mother was in custody and had not been transported to the hearing. It continued the hearing to the next day. On February 21, the court again continued the hearing to March 12, 2020, and ordered that one in-custody visit with mother occur before that hearing, subject to approval by the minor's pediatrician. The visit never occurred. The minor's pediatrician provided a note dated February 27, 2020, stating that the minor had recently been diagnosed with asthma and pneumonia and should avoid crowded places for at least five weeks.

Mother was present at the next hearing on March 12, 2020, and she informed the juvenile court that she had attempted to contact SSA but had been unsuccessful. The court issued an order for mother to contact SSA for visitation after her

---

[4] Typically, a child is transferred from an investigative social worker to an adoption social worker after a hearing under section 366.26 is set and reunification services are denied.

release from custody and for SSA to follow-up with mother as to visitation. The court confirmed that mother wished to receive notice at the Orange County Jail and ordered her to provide written notice to SSA and the court if her address changed. The section 366.26 hearing was initially continued to March 25, 2020, but was then continued several more times due to the COVID-19 pandemic. The last continuance set the hearing for June 8, 2020.

Mother was released from custody on April 14, 2020. On April 27, 2020, she left a voice message for another social worker stating that she had been released from jail and wanted to visit the minor. This message was not relayed to Hogan until May 15, 2020, and then Hogan did not contact the mother until May 29, 2020. During this call, Hogan informed mother that due to the COVID-19 pandemic, SSA offices would not be open for visits until at least June 15, 2020. She also informed mother that the minor had respiratory issues and would need doctor approval prior to visitation. Neither mother nor Hogan suggested any alternative visitation options, such as telephonic or video visits.

*D. The Section 366.26 Hearing*

The sole witnesses at the section 366.26 hearing were Hogan and mother. Hogan acknowledged that the plan adopted by the juvenile court on October 23, 2019, was for seven hours of weekly visitation and that there was no express language in the court's order modifying visitation if mother was incarcerated. But Hogan also testified that it was her understanding that visitation should not occur under the order if the mother was taken into custody. She stated that generally, a separate visitation order is required for in-custody visits, and no such order was made in this case. She further stated that the primary reason supervised visits were not set up when mother was in custody was due to concern for the minor's health.

Hogan also testified, however, that neither mother nor her counsel ever claimed that mother had been denied visitation or made any objection to her lack of

7

visitation. Hogan had not heard any such complaints until the section 366.26 hearing. Likewise, SSA received no written communications from mother while she was in custody. And aside from the message Hogan received on May 15, 2020, from mother regarding visitation, Hogan was unaware of any other contact by mother to SSA to request visits.

Hogan also described newborn visits at the Orange County Jail, when a mother is in custody: typically, the social worker holds the baby, and the social worker and baby are separated from the mother by a glass partition. Hogan opined that "usually those visits don't last long because [the babies are] small and they're usually crying. And the three-hour visit, it's just–it's not really doable. Seven hours a week."

Hogan also testified that terminating parental rights would not be detrimental to the minor because he "ha[d] never been in [mother's] custody and ha[d] always been in the care of another caretaker. [¶] So [mother] ha[d] not ever really had a relationship with the child besides kind of a friendly visitor situation." This lack of a relationship, in her opinion, was not due to any visitation oversight while mother was in custody. Hogan further believed that all of the minor's needs were being met by his caregivers and that removing him from his current placement would be detrimental to him.

Mother was to appear in juvenile court at 10:30 a.m., on June 9, either in person or electronically, to testify. She arrived at court in person at 2:54 p.m., during the middle of closing arguments. The court paused closing arguments and allowed her to testify. Mother claimed that she had missed most of her pre-custody visits due to transportation issues or because she was not feeling well. At visits, she changed the minor's diaper, fed him, burped him, held him while he slept. She kissed him and told him that she loved him. But the minor slept most of the time they were visiting.

Mother stated that she was never told that her social worker had changed while she was in custody. After two months of incarceration, maternal grandmother sent

8

her a message that a social worker named Judith was trying to contact her.[5] Mother tried calling Judith and several other social workers, but the calls either went unanswered or went to voicemail. In the case of the latter, mother stated that she could not leave messages because the mailboxes were always full. Mother estimates that she made a total of four such calls during her six months in jail.

Mother also testified that the day she was released from custody, April 14, 2020, she called Judith and left a voicemail stating she wanted to see the minor. She claimed to have called Judith at least twice a week during the first week following her release and left voicemails on about half of those calls. After the first week, she testified that she called Judith about two to three times a week. Mother stated that she did not receive a call back from Judith for almost a month. When the two finally connected, Judith said she would check with the minor's doctor to see if visitation was safe. The next time mother heard from SSA was a call from Hogan that occurred about a week or two after her conversation with Judith (which was about a week or two before the section 366.26 hearing). Mother again requested visitation, and Hogan stated she would check with the minor's doctor to see if visitation was allowable due to the minor's asthma. Mother testified that Hogan never got back to her, but she also admitted that she did not attempt to contact Hogan regarding the progress of the request.

In all, mother estimated that from the time of her arrest on October 23, 2019, to the date of the section 366.26 hearing, she made about 30 to 40 calls to SSA social workers regarding visitation. She testified that on some of these calls, she left voicemails that were never returned. But mother also conceded that prior to her incarceration, she had almost daily contact with social workers and did not have any difficulty reaching them.

---

[5]  Judith was the assessment social worker on the case. She was responsible for assessing the placement of the minor with maternal grandmother.

9

After testimony and closing arguments concluded, the juvenile court denied mother's request for a continuance of the section 366.26 hearing. Mother had requested the continuance to allow her to make up the missed visitation. The court then found that none of the exceptions under section 366.26, subdivision (c), applied and that termination of parental rights and placement of the minor for adoption was in the minor's best interest. In making these findings, it stated "that the conduct of [SSA] was not such as to preclude mother from marshaling . . . an argument that would have raised [an exception] . . . [and] that SSA did not predetermine the result of this matter." Further, "[t]here [were] circumstances . . . such as the child's age that made it challenging and that would have called for mother being proactive."

The juvenile court considered mother's lack of visitation and lack of effort as to the offered services prior to being taken into custody. Had mother "put forth a greater effort in engaging services, in engaging testing, and perhaps being more active in her efforts to visit the [minor]," she would have been in a better "position to marshal an argument that family reunification services should have been extended in October." It was not SSA's fault that mother failed to take advantage of these opportunities, or that mother was taken into custody.

The juvenile court also found certain portions of mother's testimony lacked credibility: "it strikes the court as an anomaly that [mother] was able to reach out every day, according to her testimony, at the initial stages of these proceedings, and then subsequently, despite 30 to 40 calls, was unable to ring a bell." Due to this discrepancy, the court was "not persuaded that mother was as proactive as she . . . testified to here in court." The court was also skeptical given that mother never tried to communicate with SSA in writing after so many unsuccessful phone calls. The court found this failure especially notable given its order for mother to provide written notice to SSA and the court of any change in her contact information.

10

As to the visitation issues that occurred after mother was arrested, the juvenile court found that SSA discharged its duties and obligations based on the circumstances. The court remarked that its order specifically authorized SSA "to liberalize or restrict visitation or visitation protocols as might be appropriate" and that "any party aggrieved by the exercise of such discretion . . . [could] move the matter before the court and the court would hear the matter de novo." The court then noted that it had addressed visitation at various times in the proceedings. In particular, it mentioned the February 21, 2020 order for a single visit, "which indicated a significant departure from the previous order for seven hours of visits." The court then noted that visitation was again addressed at the March 12 hearing. The COVID-19 pandemic subsequently occurred, the court was closed, and the prior orders of the court remained. Given these facts, the court found that "this is not a situation where . . . the fault can be laid at SSA's doorstep."

Following the termination of her parental rights, mother appealed.

II

DISCUSSION

*A. Standard of Review*

On appeal, mother argues her due process rights were violated because "SSA failed to comply with the juvenile court's orders for visitation, and the juvenile court failed to ensure its orders were followed . . . ." She claims these failures prevented her from developing the type of relationship with the minor necessary to either establish the parental relationship exception (§ 366.26, subd. (c)(1)(B)(i)) or to file a petition for return of the minor under section 388. The only way to alleviate this deprival of due process, she contends, is for this court to reverse the juvenile court's order and instruct it to hold a new section 366.26 hearing after mother has made up the missed visitation.

11

Only then can the juvenile court properly determine whether parental rights should be terminated.

A juvenile court's ruling on a section 388 petition is reviewed for an abuse of discretion. (*In re S.J.* (2008) 167 Cal.App.4th 953, 959-960.) As to review of the applicability of the parental relationship exception, appellate courts have adopted different standards. (*In re Noah G.* (2016) 247 Cal.App.4th 1292, 1300.) Here, however, mother does not argue that the court wrongly denied a section 388 petition or that it incorrectly failed to apply the parental relationship exception. Rather, she argues that SSA and the court deprived her of visitation with the minor, which prevented them from forming the type of relationship necessary to establish the parental benefit exception or file a section 388 petition.

Given the nature of this argument and the relief sought by mother, the appeal really challenges the juvenile court's denial of her request to continue the section 366.26 hearing and denying her the chance to make up the missed visitation time. We review this decision for an abuse of discretion. (*In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1044; *In re Karla C.* (2003) 113 Cal.App.4th 166, 180.) A court abuses its discretion "when a decision is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice." (*Ibid.*) To warrant a reversal, the court's decision must be "'so irrational or arbitrary that no reasonable person could agree with it.'" (*People v. Clark* (2019) 43 Cal.App.5th 270, 292.) "When the trial court's exercise of its discretion relies on factual determinations, we examine the record for substantial evidence to support them." (*Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 390.) In conducting this review, the "'appellate court does not reweigh the evidence or evaluate the credibility of witnesses, but rather defers to the trier of fact.'" (*City of Glendale v. Marcus Cable Associates, LLC* (2014) 231 Cal.App.4th 1359, 1385.)

12

*B. Merits*

We find no violation of mother's due process rights and, consequently, the juvenile court properly exercised its discretion by denying mother's request for a continuance.

"It is axiomatic that due process guarantees apply to dependency proceedings. . . . But due process also is a flexible concept, whose application depends on the circumstances and the balancing of various factors." (*Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 756–757.) "Under section 366.26 . . . a parent may avoid termination of parental rights . . . if the parent has *maintained regular contact and visitation with the child*, and the child would benefit from continuing the relationship. [Citation.] To overcome the statutory preference for adoption, the parent must prove he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment of the child to the parent. [Citations.] 'Obviously, the only way a parent has any hope of satisfying this statutory exception is if she maintains regular contact with her child.' [Citation.] If a parent is deprived of visitation with his or her child, the parent is not going to be able to establish the exception or have any meaningful opportunity to avoid the termination of parental rights . . . . [Citations.] Thus, the erroneous denial of parent-child visitation compromises a parent's due process rights to litigate and establish the [parental relationship] exception." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1007.)

No erroneous denial of visitation occurred here. Mother does not take any issue with the substance of the juvenile court's visitation orders. Instead, she contends her due process rights were violated because SSA failed to comply with the court's orders and the court failed to ensure its orders were followed. But if mother was unhappy with how SSA was applying the court's visitation orders, the burden was on her to raise the issue in a timely manner. "The role of the [SSA] and its agents in dependency proceedings is subject to the juvenile court's supervision and control. If the agency is

13

abusing its responsibility in managing the details of visitation, appellant may bring that matter to the attention of the juvenile court . . . ." (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1010.) "'"The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal."'" (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.)

Mother was represented by counsel at all times. Nothing in the record indicates that she made any attempt to inform the juvenile court after being taken into custody that she believed SSA was not complying with the court's visitation order. Indeed, at the February 21, 2020 hearing, after mother had already been in custody for four months, she did not complain about lack of visitation with the minor, nor did she request any specific visitation order. At that hearing, she also made no objection when the court ordered a *single* in-custody visit to occur before March 12, 2020, subject to physician approval. The visit never occurred since the minor's pediatrician did not approve the visit due to a health condition that would take roughly five weeks to resolve.

Then, at the hearing on March 12, 2020, with regard to visitation, mother only requested that SSA monitor the minor's health and "remain vigilant about reassessing the feasibility of an in-custody visitation." She did not request any other visitation order. And, again, she did not make any specific complaint about the lack of visitation.

During her entire time in custody, mother failed to raise the issue of lack of visitation with the juvenile court. She cannot complain now that the court did nothing to help her. Absent a request from mother, it is not the court's burden to sua sponte come up with a solution to her lack of visitation. (See *In re Sofia M.*, *supra*, 24 Cal.App.5th at

14

p. 1046.) "The court does not err by failing to do that which it is not requested to do." (*Ibid*.)

Further, even if mother had been given seven hours of weekly visits while in custody, it is unreasonable to think that she and the minor would have developed the depth of relationship necessary to invoke the parental relationship exception or to file a successful section 388 petition. "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an *extraordinary case* that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, italics added.) "To meet the burden of proof [for the parental relationship exception], the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits. [Citation.] The parent must demonstrate more than incidental benefit to the child. In order to overcome the statutory preference for adoption, the parent must prove he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment of the child to the parent." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) "Even if parents demonstrate a substantial emotional attachment, '[t]he benefit to the child from continuing such a relationship must also be such that the relationship "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'"'" (*In re A.S.* (2018) 28 Cal.App.5th 131, 153.)

At best, any in-custody visitation would have been limited to the period prior to the end of February 2020, before the minor's health issues prevented visitation from occurring. The unrebutted testimony at the hearing showed that even if such in-custody visitation had occurred, the minor, who was an infant, would have been separated from mother by a glass partition and held by a social worker. Nothing in the record shows that mother would have been able to hold, feed, or change the minor. And, as

15

Hogan testified, given the age of the minor, it is doubtful that such visits would have been able to last the full three and a half hours. Given these circumstances, it is unreasonable to believe that mother, who never had custody of the minor, would have been able to develop the relationship required to avoid termination of parental rights. Especially considering mother missed the majority of her visits prior to her incarceration and left early during several of the visits she attended.

We also see no due process violation during the period after mother was released from custody on April 14, 2020. Upon her release, mother had not seen the minor in nearly seven months, and the COVID-19 pandemic had been ongoing for weeks. Due to the pandemic, the juvenile courts had been closed since March 13, 2020, and SSA offices were not open for visits. Hogan "also had a doctor's note saying the [minor could not] be visiting due to the COVID-19." The concerns over the minor's health outweighed any potential benefit from visitation, particularly given that family reunification services had been denied months prior. Reunification of mother and the minor was not the primary goal of this case. The focal point was the minor's "placement and well-being, rather than on [mother's] challenge to custody. . . . By the time [the] permanency hearing [was] set, the [minor]'s private interest in a safe, permanent placement outweigh[ed mother]'s interest in preserving a tenuous relationship with the child." (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 223.)

The juvenile court alluded to these health concerns in its ruling. It noted that its order authorized SSA "to liberalize or restrict visitation or visitation protocols as might be appropriate." And it found that under the circumstances, the court and SSA discharged their duties. Specifically, after the visitation order on February 21, 2020, SSA "had the [minor] evaluated medically. And there was a determination that the child, certainly as of February–and that's the cold and flu season, and given the child's medical issues–was not appropriate for a jail visit. Circumstance would hardly seem to have improved during the social lockdown that occurred after March 13th." While mother

16

contends that SSA never suggested any type of virtual visitation, mother did not make any specific request for it. And even if she had been awarded such visitation, for the reasons stated above regarding in-custody visits, we find it unreasonable to believe that she would have been able to develop the relationship necessary to invoke the parental relationship exception or file a successful section 388 petition.

Given that there was no violation of due process, the juvenile court properly exercised its discretion to deny mother's request for a continuance. At the time of the section 366.26 hearing, the minor had never been in mother's custody. He was 10 months old and had not seen mother for over eight of those months. And during the minor's first two months of life, mother failed to take advantage of the opportunities afforded her. Prior to her incarceration, she did not engage in services, skipped her drug testing, and, crucially, missed the majority of her allotted visitation with the minor. Indeed, prior to her arrest on October 23, 2019, the last time mother had seen the minor was on September 18, 2019, when he was only seven weeks old. And she only stayed for one hour of a three-and-a-half-hour scheduled visit. Mother then missed several visits and could not be reached, so on October 15, 2019, SSA put mother's visits on hold until mother called to arrange a visitation schedule.

Once arrested, mother failed to raise any issue with the juvenile court regarding her lack of visitation. Then, after the court ordered a single in-custody visit, the minor could not visit mother in jail due to health concerns. After mother was released, health concerns again prevented mother from visiting the minor due to the onset of the COVID-19 pandemic. By the time mother raised the issue of improper visitation at the 366.26 hearing, her opportunity to develop a parental relationship with the minor had passed. The court's focus at the hearing was not on mother's reunification with the minor, but on the minor's interest "in a safe, permanent placement." (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 223.)

17

We are not persuaded by mother's citation to *In re Brittany S.* (1993) 17 Cal.App.4th 1399 (*Brittany S.*). *Brittany S.* involved a reunification plan for a mother who was incarcerated when her child was already two years old. (*Id*. at pp. 1402-1403.) The appellate court found the plan failed to offer the mother adequate reunification services because it limited her contact to phone calls and letters and failed to offer in-person visitation. This was a violation of the reunification statute, which states "the plan should also include '[v]isitation services, where appropriate.'" (*Id*. at p. 1407.) Further, the juvenile court found that "[v]isitation could well have made the difference . . . because, contrary to the trial court's findings, [the mother] substantially complied with the service plan" by addressing "'her issues of drug abuse and criminal lifestyle through programs available at state prison.'" (*Ibid*.)

In contrast, this case did not involve reunification. Those services had been denied. Thus, the focus here was not on the relationship between mother and the minor, but on the minor's interest in stability and permanency. (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 223.) Further, as explained above, in-custody visitation could not reasonably have been expected to create the type of parental bond needed to avoid the termination of mother's parental rights. Finally, unlike *Brittany S.*, by at least the end of February 2020, the minor had health issues that made visitation a risk to his well-being.

18

### III

### DISPOSITION

The juvenile court's order is affirmed.


                                                 MOORE, ACTING P. J.

WE CONCUR:


IKOLA, J.


GOETHALS, J.