Filed 1/23/14  In re Lillian P. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re LILLIAN P. et al., Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B248716 (Super. Ct. Nos. J068202, J068203) (Ventura County) |
| VENTURA COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. S.P. et al., Defendants and Appellants. | |

Parents of minor children appeal an order terminating their parental rights. (Welf. & Inst. Code, § 366.26.)[1]  We affirm.

FACTS

Shauna P. (Mother) is the mother of Lillian P. and F. B.  Jesse B. (Father) is the father of F.  Lillian's father is not a party to this appeal.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

On March 10, 2011, the Ventura County Human Services Agency (HSA) filed a juvenile dependency petition under section 300, subdivisions (b) and (g). At the time the petition was filed, Lillian was two years old and F. was one year old. A report filed by HSA in support of the petition stated:

In January 2011 Mother was convicted of child endangerment. The police found her lying on the grass outside her home, heavily intoxicated. Her children had been left without supervision.

Mother is 24 years old. She admitted that she has been an alcoholic since age 14. She has a history of convictions for substance abuse and violence. Mother also suffers from mental health problems, including bipolar disorder.

After Mother's child endangerment conviction, she entered a residential drug and alcohol abuse treatment program with her children. Program personnel reported to HSA that Mother was close to being discharged from the residential program for fighting with other residents. The person reporting the matter stated she was concerned for the safety of the children because Mother has a violent temper and does not watch her children.

The report also noted that Father has a history of criminal violence and substance abuse, and is currently incarcerated for domestic violence against Mother. He is scheduled to be released in June 2012. He has not seen F. since she was 10 months old.

The trial court granted the petition. The court ordered family reunification services for Mother. The court did not order reunification services for Father. Mother was granted supervised visitation with the children.

The HSA report prepared for the six-month review recommended termination of services to Mother and that the children remain in foster care with a permanent plan of adoption. The report stated:

Mother did not follow her case plan. She did not follow through with a referral to a counseling program to address her anger. She was dropped from another program for fighting. She was arrested for public intoxication after she got into a fight

2

with her ex-boyfriend's girlfriend. She described the victim as Al[l] bloody." HSA concluded, "[M]other demonstrated that she was not willing to alleviate the risks which would have kept the children safe and cared for."

Mother attended 74 percent of her visits. She missed one of the visits because she decided to go with her friends to Santa Barbara rather than visit her children. Initially, HSA described the visits as "overwhelming for the mother." Later a visit was described as "'OK.'" For the rest of the visits Mother was described as "'doing well'" or "having a 'good' visit." Lillian lets out a "'scream of excitement'" when she sees Mother. F., however, is reluctant to hug Mother. HSA concluded, "Mother continues to struggle to parent the children."

The trial court terminated Mother's reunification services and set the matter for a hearing pursuant to section 366.26 (.26 hearing).

The HSA report prepared for the .26 hearing stated that the children are living with foster parents who want to adopt them. The children are thriving and overcoming behavioral and developmental problems. The girls refer to their foster mother as "Mommy." Lillian refers to Mother as "Shauna." The girls display no separation anxiety when Mother's visit ends. When the visits end, the girls run to their foster mother with open arms. A case worker described Mother as having difficulties with her parenting skills and as "'sometimes not very nurturing.'" The report concluded that mother's relationship with the children is not as strong as the relationship between the prospective adoptive parents and the children.

Mother testified at the hearing. She said the times when she missed visits with her children it was because her "mental health wasn't stable." She said she is on medication and is now stable. She has not missed any visits in the last six months. Mother testified the girls are happy when the visits start and sad when they end.

Mother said it would be detrimental to the girls to end their relationship with her. She said the girls are "so attached" to her and her family. Lillian is old enough to know that something is not right and wants to go home with Mother. Having Lillian

3

out of her life will be detrimental "because she will remember who I am."  F. is getting older and she will remember who Mother is also.

The trial court found by clear and convincing evidence that the children were likely to be adopted.  The trial court also found the beneficial relationship exception to adoption did not apply.  The court terminated parental rights.

DISCUSSION

I.

Mother contends that the trial court erred by terminating her parental rights because she established the beneficial parental relationship exception to adoption.

Section 366.26, subdivision (c)(1)(B) requires the juvenile court to terminate parental rights if it finds by clear and convincing evidence that a child is likely to be adopted, unless "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" due to an enumerated statutory exception. The beneficial parental relationship exception of section 366.26, subdivision (c)(1)(B) requires a showing of "'regular visitation and contact and the child would benefit from continuing the relationship.'"  (*In re Dakota H.* (2005)132 Cal.App.4th 212, 229.)  "To meet the burden of proof, the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits."  (*Ibid.*)  The parent must establish the existence of a relationship that promotes the child's well-being to such a degree as to outweigh the well-being the child would gain in a permanent home with adoptive parents. (*In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)  Only in the "extraordinary case" can a parent establish the exception because the permanent plan hearing occurs after the court has repeatedly found the parent unable to meet the child's needs.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

The exception requires proof of "a *parental* relationship," not merely a relationship that is "beneficial to some degree but does not meet the child's need for a parent."  (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)  The existence of a beneficial relationship is determined by the age of the child, the portion of the child's life spent in parental custody, the quality of interaction between parent and child, and the

4

child's particular needs, among other factors.  (*In re C.B.* (2010) 190 Cal.App.4th 102, 124; *In re Amber M.* (2002) 103 Cal.App.4th 681, 689 [beneficial relationship may exist when children were in mother's care the majority of their lives].)

Historically, courts have applied the substantial evidence standard of review.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576.)  Recently, *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315, applied the substantial evidence standard to the trial court' determination whether a beneficial relationship exists, and the abuse of discretion standard to the court' determination whether the relationships so important that it compels a plan other than adoption.  Here we affirm under either standard.

"In viewing the evidence, we look only to the evidence supporting the prevailing party.  [Citation.]  We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact.  [Citation.]  Where the trial court or jury has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable.  [Citation.]  The trier of fact is not required to believe even uncontradicted testimony.  [Citation.]"  (*Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 241.)

The trial court found Mother maintained regular visitation and contact with the children.  But Mother failed to carry her burden of showing a beneficial relationship outweighs the benefits of adoption.

The children were removed from Mother's custody when they were quite young, one and two years old.  At best, there is evidence of frequent contact, an emotional bond and pleasant visits.  But that is not enough.  There is no evidence of a "parental relationship," and certainly no evidence of a relationship between Mother and the children that would outweigh the benefits of adoption.

## II.

Father contends HSA failed to comply with the Indian Child Welfare Act.  (ICWA; 25 U.S.C. § 1901 et seq.)  Mother joins in Father's contention.

Congress enacted ICWA with the intent that the best interests of Indian children are served by retaining their Indian tribal ties and cultural heritage.  (*In re*

5

*Desiree F.* (2000) 83 Cal.App.4th 460, 469.) "'ICWA confers on tribes the right to intervene at any point in state court dependency proceedings. . . .'" (*In re Karla C.* (2003) 113 Cal.App.4th 166, 174.) Proper notice to tribes is of critical importance, and courts strictly construe ICWA notice requirements. (*Ibid.*) "Under the ICWA, the tribe determines whether the child is an Indian child and its determination is conclusive. [Citation.]" (*Ibid.*) When the court knows or has reason to know that an Indian child is involved, HSA must notify the Indian child's tribe of the pending proceedings and its right of intervention. (*In re Desiree F.*, *supra*, at p. 469.)

Father claims HSA never inquired of him about possible Indian ancestry. But the record shows Father signed an ICWA-020 form under penalty of perjury declaring that to his knowledge he has no Indian ancestry. That satisfies the duty to make an ICWA inquiry as to Father. (See Cal. Rules of Court, rule 5.481 (a)(2)(4).)

Mother initially signed a similar declaration. But after the .26 hearing was set and continued, Mother declared that she might have some Cherokee Indian ancestry. HSA completed ICWA-1030 forms for maternal relatives who were in the direct line of assent from Mother. HSA served the forms along with a copy of the section 300 petitions on the Bureau of Indian Affairs (BIA) and three Cherokee bands. All parties responded that they had no information that the children were members or eligible to be members of the tribe. The trial court found that ICWA did not apply.

Father argues HSA did not provide the court with any information about Mother's statements, nor about the ICWA inquiry it made regarding her ancestry. But HSA provided the court with copies of the notices sent to the tribes with the return receipts and the correspondence received from the tribes relevant to the children's status. That is all that is necessary. (See *In re Jennifer A.* (2002) 103 Cal.App.4th 692, 702.)

Father complains that his name and the names of his relatives were omitted from the ICWA notice sent to the tribes. He also complains that the form references both children even though only F. is his child.

But Father denied any knowledge of Indian ancestry.  The omission of information on non-Indian relatives is subject to the harmless error rule.  (See *In re Cheyenne F.* (2008) 164 Cal.App.4th 571, 576.)

Father asserts it can be concluded that the tribes were unable to conduct a complete search because his and his ancestors' names were omitted from the notice.  But given Father denied any knowledge of Indian ancestry, he does not suggest how it is reasonably probable that such a complete search would have led to a different result.  Nor does Father suggest how the inclusion of both children's names on the notice could be prejudicial.

Father points out that the notices were served on the BIA and tribes on September 21, 2012, for the September 27, 2012 hearing.  This was less than the 10-day period required for the notice.  (§ 224.2, subd. (d).)  But the .26 hearing was continued several times.  It was held on April 4, 2013.  There was more than an adequate period of notice.

The judgment is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P. J.


We concur:


YEGAN, J.


PERREN, J.


7

Ellen Gay Conroy, Judge

Superior Court County of Ventura

_____

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant Jessee B.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant Shauna  P.

Leroy Smith, County Counsel, Patricia McCourt, Assistant County Counsel, for Plaintiff and Respondent.