Filed 8/18/22  In re G.S. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re G.S., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>    Plaintiff and Respondent,<br><br>v.<br>S.S.,<br><br>    Defendant and Appellant. | A164018<br><br>(Contra Costa County<br>    Super. Ct. No. J19-00740) |

S.S. (mother)[1] appeals from an order terminating her parental rights under Welfare and Institutions Code section 366.26.[2]  Mother contends the juvenile court erred in concluding the beneficial-parental relationship exception to termination did not apply because it did not consider the exception in conformance with the principles articulated in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).

_____

    [1] Father is not a party to this appeal.

    [2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

We conclude the juvenile court did not err and affirm.

## BACKGROUND

*Proceedings Before Section 366.26 Hearing*

The juvenile court took jurisdiction of then-one-year-old G.S. (minor) and removed her from mother's care, after mother admitted, and the court sustained, allegations that minor was at a substantial risk of harm and neglect in that "there have been multiple instances of domestic violence . . . between the mother . . . and [father], in the presence of the children"[3] and that "mother has allowed [father] to continue to reside in the home, despite [an] active restraining order, placing the children at substantial risk of serious harm."

At the disposition hearing, the court adopted the Contra Costa County Children and Family Services Bureau's (Bureau) recommendations of continued services and visitation.

Over the next 18 months, the Bureau recommended terminating services to mother. Despite mother's lack of compliance with her case plan, the juvenile court extended services due in part to extending services to father and because of the lack of in-person visits due to the pandemic. At the 18-month hearing, the court stated, "despite previously making . . . generous accommodations and . . . extending services to the 18 months, which has now become . . . 22 months," mother "failed to really comply with her plan," and "continued in one of the most destructive and toxic relationships with [father]." After recounting the history of the proceedings, the court terminated services and set the matter for a section 366.26 hearing.

---

[3] Mother has three other minor children, minor's half-siblings, none of whom reside with her. Those children were removed from her care, and the juvenile court ordered physical and legal custody to their non-offending fathers.

2

*Section 366.26 Hearing*

In its 366.26 report, the Bureau recommended termination of parental rights and making adoption the permanent plan for minor. The Bureau provided a detailed account of visitation: At the start of visitation, in 2019 and early 2020, mother, minor, and minor's half-siblings would do group visits. Mother was "always affectionate with [the children]," though she "paid special attention to [minor]." Mother took pictures of the children, "always had a snack for [minor] and changed her diaper when needed." At the end of one visit in January 2020, minor "cried and did not want to say goodbye to the mother." Later when visits switched to video calls in March 2020, minor "lost interest quickly," or would get "bored quickly and [leave] camera range" and mother "mostly talked" to minor's half-sibling.

The visits switched back to in-person in September 2020, and initially minor "began to cry when the foster mother put her down, but she ran to hug mother when she saw the mother." The visits continued to be positive until the time of the hearing. Mother brought snacks for minor, minor "ran to hug" mother and her siblings, and they would all play games. The "visits ended calmly." The Bureau noted mother and minor "do have a significant parent/child relationship, but it does not outweigh the benefits of legal permanency for the child."

At the section 366.26 hearing, the court heard from the social worker, mother, and counsel.[4]

The social worker testified minor "takes the visits pretty well and she goes to the visits happily and she comes back from the visits happily and there's not too much emotional upset before or after the visits." In the past, minor had called mother " 'mommy,' " but now called her " 'La Señora,' "

---

[4] The court also heard from father.

3

which means " 'The woman,' in Spanish." The worker opined that while mother did have a relationship with minor it did not "outweigh the permanence of adoption." Minor "is a very young child. She just turned 3 years old. She has spent just about the last two years of her life outside of the mother's care, and in the meantime, she has developed a very strong parent/child relationship with her foster parents, and I do think there's a lot of value for her having stability in knowing where she is going to reside and where she's going to be raised."

Mother testified she and minor "play on visitations but mostly we love how we feel being together when we see each other." Mother saw "immense happiness in [minor]" when she came to visits. Minor said, " 'No,' " when mother asked if "she wanted to leave."

Counsel for mother, referencing *Caden C.*, argued there was "uncontroverted evidence that the mother has a significant bond, substantial bond with this child. I think the detriment to the child for this relationship to be broken is obvious now, and most compelling in the last visit they had where [minor] was saying that she didn't want to leave. She is only 3 so she doesn't have the vocabulary at this point, but it's obvious that she is filled with joy in seeing her mother and I think the detriment to breaking off that relationship is clear, that it will be traumatic for her to break off this relationship. And so I think the third prong is met."

Counsel for the Bureau urged the court to find the parental exception to termination did not apply. Counsel noted while the social worker stated mother had "consistently" visited and had, "a significant relationship with [minor]," it "does not outweigh adoption, or the permanence of adoption." Minor "looks to her foster parents for affection. She seeks them out. She's calling them 'Mommy' and 'Poppy'." Counsel urged the court to consider "the

4

length of time that [minor] has been with these foster parents," which had "been the majority of her life." Additionally, there was "no evidence [minor] asks to see her parents . . . in between visits. There is no evidence that she acts negatively when the visit ends. . . . There's no indication that [minor] has a greater need for this visitation between the parents as opposed to what the permanence of adoption gives her."

Minor's counsel joined with the Bureau's counsel adding, "This is an outing that [minor] goes on. She gets in the car with [her case assistant], she goes to the visit, she gets to play with someone who loves her and brings her gifts and candy. I know she has a very good time during these visits, but that's not the point." Counsel noted the visits never moved beyond supervised visits, "[t]here are still safety risks and [minor] . . . deserves to not be in the system any longer."

The court began by stating the report was "thorough," and discussed "visitation almost from the inception of the case," discussed how minor was doing in her foster parents' home and gave a "good overview of [minor] and what her needs are." The court acknowledged that mother loved minor but stated that was "not really the question here," rather the hearing was to "determine the most permanent plan for [minor]." Minor was "3 years old and 3 months," she is a "happy social child" who "gravitates to her foster parents when she is hungry, tired or hurt and seeks assistance from them. . . . She refers to them . . . as 'Babi' and 'Papi'. She has lived with them for two years. These are her parental figures. She loves them."

The court then found no exception applied, and addressed its reasons at length:

"The mother has, for the most part, consistently visited with [minor]. The visits have shown that the mother has been nurturing to [minor],

5

that she has been loving towards [minor], that [minor] has engaged with her in a very lovely way.

"This case has been going on now for over two years and the mother has continued in her visitation. . . . [¶] The description of the visits are clear. The mother has brought her clothing. I thought it was sweet how she described the visits go from her perspective. She brought food. During those hours of supervised visits they have enjoyed each other's company and I do think that they have a relationship. So under the first two prongs visits have been consistent and they do have an ongoing relationship.

"The issue is the quality and nature of that relationship and whether or not it ultimately outweighs the benefit of permanence to [minor]. [¶] Adoption would provide complete stability and permanence for [minor]. She is a 3-year-old child who has lived in this home for two years. She has enjoyed a close relationship with people who she perceives to be her parents. They meet her every need. While she has enjoyed visits with her mother and they have been described, [the social worker] testified that the benefit and stability of adoption would be best for [minor], and I concur with that assessment. I also do not believe it would be detrimental to [minor's] best interest to terminate parental rights, and I say that taking into account truly the mostly very good relationship and visitation that [minor] enjoyed with her mother.

"I truly wish that much earlier on in this case that [mother] had been able to truly focus on her plan. I'm hearing she started something in late October, but I truly wish much earlier on she had been able to focus on her plan and to do the things that she needed to do in order to be able to reunify with [minor]. But we had a very protracted contested hearing related to the termination of services, and as—and I will not repeat myself. Both parents were actually given a plethora of services and time, and they continue to have their toxic relationship to abuse substances and to continue and engage in domestic violence incidents, much to the detriment of their ability to reunify with [minor].

"So with [minor] having been in this home for two years it is pretty clear that that is her world. She looks to them as her parents. That is the stability that the code prefers, and that is the nature of the quality of that relationship that she shares with her resource care providers,

her being comfortable in that home, being happy in that home and stable in that home. I think it's abundantly clear that it would be more detrimental to not have that type of stability that she needs and desires, and it would not be a service to [minor] to have her be in some limbo when she could and will be adopted. [¶] I don't want to seem insensitive to the parents. I really listened very carefully to what both of them had to say, but particularly [mother] and her testimony. I genuinely do believe that the visits that they had were nice visits. I also agree with [minor's counsel] that the visits were very fun visits and visits where the mother did take some parental roles in it and nurtured her, but they were also visits that could be referred to as friendly."

The court found minor to be adoptable and terminated mother's parental rights.

## DISCUSSION

"At the section 366.26 hearing, the question before the court is decidedly not whether the parent may resume custody of the child." (*Caden C., supra*, 11 Cal.5th at p. 630.) Instead, the purpose of a section 366.26 hearing, is to select and implement a permanent plan for the child. (*Ibid*.) "[T]he court must first determine by clear and convincing evidence whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).) If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. (See § 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).)" (*Caden C., supra*, 11 Cal.5th at pp. 630–631.) One of those exceptions is the parental-benefit exception. (*Id*. at p. 631.)

The proponent of the exception, as is mother here, must establish, by a preponderance of the evidence three elements: "(1) regular visitation and

contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C., supra*, 11 Cal.5th at pp. 631, 637, italics omitted.)

" 'The first element [of the exception]—regular visitation and contact— is straightforward. The question is just whether "parents visit consistently," taking into account "the extent permitted by court orders." ' " (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*), quoting *Caden C., supra*, 11 Cal.5th at p. 632.)

"The second element, in which the court must determine whether the child would benefit from continuing the relationship with her parent, is more complicated. '[T]he relationship may be shaped by a slew of factors, such as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." [Citation.]' (*Caden C., supra*, 11 Cal.5th at p. 632.) '[C]ourts often consider how children feel about, interact with, look to, or talk about their parents.' (*Ibid.*) *Caden C.* instructs us that 'it is not necessary—even if it were possible—to calibrate a precise "quantitative measurement of the specific amount of 'comfort, nourishment or physical care' [the parent] provided during [his or] her weekly visits." [Citation.]' (*Ibid.*) Expert opinions or bonding studies provided by psychologists who have observed and/or reviewed the parent-child relationship are often 'an important source of information about the psychological importance of the relationship for the child.' (*Id.* at pp. 632–633, fn. omitted.) Ultimately, the court's role is to decide whether the child has a ' "significant, positive, emotional relationship with [the parent.]" ' (*Id.* at p. 633.)" (*Katherine J., supra*, 75 Cal.App.5th at pp. 316–317.)

"The third and final element asks the court to ascertain whether severing parental ties—and thus 'terminating [the] parental' relationship—would be detrimental to the child. (*Caden C., supra*, 11 Cal.5th at p. 633.) 'What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life.' (*Ibid*.) Because any harm caused by loss of this relationship may be significantly mitigated by the child's adoption into a stable, loving home, the court must then perform a delicate balancing act. The 'subtle, case-specific inquiry [that] the statute asks courts to perform [is]: does the benefit of placement in a new, adoptive home outweigh "the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]" ' (*Ibid*.) 'When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be "detrimental to the child due to" the child's beneficial relationship with a parent.' (*Id*. at pp. 633–634.)" (*Kathrine J., supra*, 75 Cal.App.5th at p. 317, fn. & italics omitted.)

"In addition to these substantive clarifications, *Caden C*. also establishes a hybrid standard of review for the beneficial relationship exception. The first two elements, which require the juvenile court to 'make a series of factual determinations' regarding visitation and the parent-child relationship, 'are properly reviewed for substantial evidence.' (*Caden C., supra*, 11 Cal.5th at p. 640.) These determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 228. . . .)" (*Katherine J., supra*, 75 Cal.App.5th at pp. 317–318.)

"But 'the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion.' (*Caden C., supra*, 11 Cal.5th at p. 640.) Accordingly, we will not disturb the juvenile court's decision unless it ' " ' exceed[s] the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318. . . .)" (*Katherine J., supra*, 75 Cal.App.5th at p. 318.)

There is no serious dispute that the trial court concluded mother carried her burden as to the first two elements.[5]

As to the final element—whether terminating the parental relationship would be detrimental to the minor—mother maintains the juvenile court abused its discretion because it "failed to properly consider how [minor] would be affected by losing her parental relationship with mother and what life would be like for her in an adoptive home with mother no longer in her life," and instead improperly "consider[ed] the degree of mother's parental roles," "mother's continued difficulties with substance abuse and domestic

---

[5] The Bureau does not directly dispute that the court found in favor of mother as to the second element. It nevertheless asserts the evidence before the court "did not demonstrate that [minor] had a significant attachment" with mother, pointing to evidence that while minor enjoyed her visits with mother, their interactions over a nearly two-year period never progressed beyond limited, supervised visits, and their relationship did not go "beyond what a child might have with a teacher or a family friend." We agree with mother that the fairest reading of the record is that the court did find that she carried her burden as to the second element. The court stated, for example, "under the first two prongs visits have been consistent and they do have an ongoing relationship." In any case, we need not address the issue further since, as we shall explain, we conclude the court did not err in ruling mother did not carry her burden as to the third element.

violence," and "the prospective adoptive parents' role as parental figures in [minor's] life." (Italics omitted.)

Mother relies on a number of post-*Caden C.* cases—*In re L.A.-O.* (2022) 73 Cal.App.5th 197 (*L.A.-O.*), *In re D.M.* (2021) 71 Cal.App.5th 261 (*D.M.*), *In re J.D.* (2021) 70 Cal.App.5th 833 (*J.D.*), and *In re B.D.* (2021) 66 Cal.App.5th 1218 (*B.D.*).

However, none of these cases assist mother here, as the courts in those cases focused on the *second* element of the *Caden C.* analysis and we have agreed with mother that the juvenile court found she carried her burden on this element. In each of these cases, the juvenile courts found insufficient relationships between the parents and minors, and made termination rulings prior to *Caden C.* (*L.A.-O., supra,* 73 Cal.App.5th at p. 205 [parents " 'have not acted in a parental role in a long time' "]; *D.M., supra,* 71 Cal.App.5th at p. 268 [father " '[h]as not risen to the level of a parent' "]; *J.D., supra,* 70 Cal.App.5th at p. 851 [court "found their relationship did not 'amount to [a] parental bond' "]; *B.D., supra,* 66 Cal.App.5th at p. 1224 [court "determined that they did not fulfill a parental role"].) The appellate courts variously concluded the records were insufficient to discern whether the juvenile courts had considered factors *Caden C.* held were not pertinent to the second element, or affirmatively demonstrated the juvenile courts had done so. (*L.A.-O.,* at pp. 211–212 [juvenile court's "ruling was terse" and it was unclear from court's terminology whether it considered improper criteria]; *D.M.,* at p. 271 [juvenile court considered "factors which *Caden C.* has explained are inappropriate"]; *J.D.,* at p. 865 ["court appears to have applied the wrong legal standard under *Caden C.* in evaluating the second element"]; *B.D.,* at pp. 1228–1229 [court relied "on improper factors"].)

In *B.D.,* the court also expressed concern that the juvenile court's reliance on improper " 'parental role' " factors in finding an insufficient parent-child relationship may have impacted the court's balancing of the "harm of severing the natural parent-child relationship to the benefits of a new adoptive home in the crucial third step of the analysis." (*B.D., supra,* 66 Cal.App.5th at p. 1230.) But, again, there is no such concern here, as the juvenile court found mother established a parent-child relationship. Nor did the court, in considering the third element improperly compare mother's "parental" relationship with that of the prospective adoptive parents. Rather, the court, after hearing the parties' arguments specifically addressing *Caden C.,* and after considering the nature of the relationship between mother and minor, ruled it was "abundantly clear that it would be more detrimental [to minor] to not have that type of stability that she needs and desires."

Mother also focuses on the court's single use of the words "parental role" in stating, "I also agree with [minor's counsel] that the visits were very fun visits and visits where the mother did take some parental roles in it and nurtured her, but they were also visits that could be referred to as friendly." Although mother does not maintain this word choice constitutes reversible error per se, she does assert the "phrase 'parental role' is not appropriate and ought not to have been used here."

To begin with, as mother acknowledges, the more recent decision of *In re A.L.* (2022) 73 Cal.App.5th 1131, demonstrates otherwise. There, the appellate court explained that "contrary to father's position, in assessing potential detriment, it was proper for the juvenile court to consider whether, and the extent to which, the caregivers and father occupied parental roles with the minor. In fact, the Supreme Court acknowledged that '[i]n many cases, "the strength and quality of the natural parent/child relationship" will

12

substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home.' (*Caden C., supra*, 11 Cal.5th at p. 634.) Thus, the strength and quality of the parent's relationship with the child, including whether that parent has a parental role, is a relevant consideration to the court's detriment finding." (*A.L.,* at p. 1157.)

While mother asserts *A.L.* represents a "split in authority," we do not agree. Rather, other cases illustrate that a juvenile court's reliance on a parent's lack of any "parental role," without more, is problematic. For example, the appellate court in *Kathrine J.* stated, "problems arise when juvenile courts use the phrase 'parental role' without explaining which meaning(s) they impart to it." (*Katherine J., supra*, 75 Cal.App.5th at p. 319.) Nevertheless, the court affirmed the juvenile court's ruling that the father had not carried his burden as to the beneficial relationship exception, despite the lower court's statement that the father " 'has not occupied a significant parental role' " with the minor. (*Id.* at p. 315.) The juvenile court had gone on to "explain[] what it meant by this"—"that father's unresolved issues with substance abuse and violence had consistently destabilized [the minor's] life for years, fatally compromising father's attempts to maintain a strong, positive emotional attachment with her." (*Id.* at p. 320.) In the instant case, of course, the juvenile court found mother had carried her burden to establish a positive relationship with minor. Moreover, the court more than adequately elaborated on the nature and quality of mother's relationship with minor, illuminating its reference to mother taking "some parental roles" as to minor.

Nor did the juvenile court improperly rely on mother's "continued struggles with the issues that led to dependency." (See *Caden C., supra*,

11 Cal.5th at p. 637.) Mother contends her "history with substance abuse and domestic violence, even if not fully resolved, may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about fitness of the parent, or rewarding or punishing a parent." Mother is correct in this regard. But that is not what the juvenile court did here. To the contrary, it is clear the court's brief comment on mother's continued struggles evidenced empathy and understanding, and merely pointed out the unfortunate reality that minor had spent more than half her life outside of mother's care. (See *Katherine J., supra,* 75 Cal.App.5th at pp. 319–320 [juvenile court properly observed that the father's "unresolved issues with substance abuse and violence" had "fatally compromise[ed]" his effort to maintain a strong relationship with the minor].)

Finally, the juvenile court did not improperly focus on "the bond and parental role of the prospective adoptive parents" and thus fail "to properly consider the ultimate question of whether termination of parental rights would be detrimental to [minor] due to her relationship with mother." To the contrary, the record demonstrates that the juvenile court correctly understood its task was to evaluate whether terminating mother's parental rights "would be detrimental" to minor. The court specifically stated, "I . . . do not believe it would be detrimental to [minor's] best interest to terminate parental rights, and I say that taking into account truly the mostly very good relationship and visitation that [minor] enjoyed with mother." It further stated, it "would be more detrimental" to minor "not to have that type of stability that she needs and desires." Thus, the court understood the third element requires "a delicate balancing" act and it was called on to determine whether "the benefit of placement in a new, adoptive home outweigh[s] 'the

14

harm [the child] would experience from the loss of [a]significant, positive, emotional relationship with [the parent].' " (*Caden C., supra,* 11 Cal.5th at pp. 633, 640.)

In referring to the prospective adoptive parents, the juvenile court stated minor had been in their home for two years, it "was pretty clear that that is her world," that she looked to them "as her parents," and that minor was "happy . . . and stable in that home," and the benefit of permanence for minor outweighed any benefit derived from the "friendly" and "fun" visits with mother. Consideration of the benefit to minor from continuing her relationship to mother and the benefit of staying in her foster parents' care is precisely what the third element requires. And, although *Caden C.* warned this analysis "is decidedly not a contest of who would be the better custodial caregiver" since a child cannot be returned to the parent's custody at a section 366.26 hearing (*Caden C., supra*, 11 Cal.5h at p. 634), the court here did not compare mother's parenting abilities to those of the foster parents.

In sum, the trial court did not abuse its discretion in ruling mother failed to carry her burden to establish a beneficial-parental relationship exception to termination of parental rights.

## DISPOSITION

The order terminating mother's parental rights to G.S. is AFFIRMED.

15

                                       _____
                                       Banke, J.

We concur:


_____

Humes, P.J.


_____

Wiss, J.*


*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A164018, In Re GS