Filed 10/22/24  In re I.M.-O. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re I.M.-O., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D084075 |
| Plaintiff and Respondent, | (Super. Ct. No. J521024) |
| v. | |
| R.O. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Alexander M. Calero, Judge.  Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant R.O.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant D.M.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Indra N. Bennett, Deputy County Counsel, for Plaintiff and Respondent.

R.O. (Father) appeals the juvenile court's order terminating his parental rights to his child, I.M.-O. (Child), under Welfare and Institutions Code[1] section 366.26. His sole contention is the juvenile court should have applied the beneficial parent-child relationship exception to adoption, under section 366.26, subdivision (c)(1)(B)(i).[2] We disagree and affirm the order terminating parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2022, the San Diego County Health and Human Services Agency (Agency) filed a petition under (1) section 300, subdivision (a), alleging Mother subjected then six-year-old Child to serious physical harm when she dragged Child, causing Child to fall and hit Child's head; and (2) section 300, subdivision (b)(1), alleging Mother suffered from untreated mental health issues, which resulted in Mother's inability to consistently provide for Child's needs. Father failed to make himself available for Child's protection.

The juvenile court sustained the petition, ordered Child removed from Mother's care, found that placement with Father would be detrimental to Child, and ordered reunification services for both parents. The court

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    Child's mother, D.M. (Mother), also appealed and joined in Father's argument.

authorized an Interstate Compact on the Placement of Children (ICPC) for maternal cousin in Nevada.

During the reunification period, Mother did not maintain contact with the Agency and did not engage in services. Father had consistent supervised visits with Child, which Child enjoyed. He initially engaged in but ultimately indicated he would not complete his court-ordered services. He also acknowledged his living situation was inadequate and was in agreement with Child being placed with maternal cousin, who also had legal guardianship of Child's older sibling. Child spent a weekend visiting with maternal cousin, was excited to move there, and eventually did in July 2023. By all accounts, Child did well in the placement with maternal cousin, who was committed to providing Child with permanency.

Father submitted on the Agency's recommendation to terminate reunification services and continue placement with maternal cousin, while Mother's counsel set the matter for trial. Due to a lack of progress and participation, the court terminated Father's and Mother's reunification services at the 12-month contested review hearing in October 2023, and scheduled a section 366.26 hearing.

During the permanent placement planning phase, Father maintained regular contact with Child via brief phone calls, which Child enjoyed. Father and Child expressed affection, saying "I love you" to each other, but Child did not seek additional time, display distress when the calls ended, or ask for additional calls. Father declined the Agency's offer to facilitate transportation for in-person visits despite consistently promising Child that he would. Their last in-person visit was the day that Child moved to Nevada to live with maternal cousin. When asked to draw or write the names of family members who lived outside of that home, Child "stated she did not

3

have anyone else to draw" and when asked if Child wanted to draw Mother, Father, friends, pets, or any other relatives, Child said " 'no. I want to draw something else.' " Child had no concerns with being adopted by maternal cousin.

At the section 366.26 hearing, Father's counsel argued for the lesser permanency plan of legal guardianship because Father did not want to lose his bond with Child. The court found Father maintained consistent visitation and contact, but found there was no substantial, positive, emotional attachment from Child to Father such that termination of the relationship would be so detrimental as to outweigh the benefits of adoption. The court concluded the beneficial parent-child relationship exception did not apply, terminated parental rights, and selected adoption as Child's permanent plan.

DISCUSSION

Father contends the juvenile court erred in declining to apply the beneficial parent-child relationship exception. We disagree. Substantial evidence supports the court's finding that Child did not have a substantial, positive, emotional attachment to Father, and the court was within its discretion in declining to apply the exception.

"After reunification services have terminated, the focus of a dependency proceeding shifts from family preservation to promoting the best interest of the child including the child's interest in a 'placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. [Citation.]' " (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) At a permanency plan hearing, the court may order one of three alternatives: terminate parental rights and order adoption, appoint a legal guardian, or place children in long-term foster care. If the child is adoptable, there is a strong preference for adoption over the

alternative permanency plans. (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.) Once the juvenile court finds the child is adoptable, the burden shifts to the parent to demonstrate that a statutory exception applies. (*Id.* at p. 1225; § 366.26, subd. (c)(1).) If the parent does not establish the applicability of a statutory exception, the juvenile court must terminate parental rights. (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*).)

One exception is when a beneficial parent-child relationship exists. (§ 366.26, subd. (c)(1)(B)(i).) It applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid.*) This exception requires the parent to prove three elements: "(1) regular visitation and contact, taking into account the extent of visitation permitted; (2) a substantial, positive, emotional attachment to the parent— the kind of attachment implying that the child would benefit from continuing the relationship; and (3) a showing that terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re M.G.* (2022) 80 Cal.App.5th 836, 847.)

"We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parental relationship, for substantial evidence." (*In re B.D., supra*, 66 Cal.App.5th at p. 1225, citing *In re Caden C.* (2021) 11 Cal.5th 614, 639–640 (*Caden C.*).) We do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will not disturb the juvenile court's findings even where substantial evidence to the contrary also exists. (*Caden C.*, at p. 640, citations omitted.) "[T]he

5

ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [the] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*) A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

Here, the juvenile court found Father satisfied the first element of regular visitation and contact with Child. The Agency does not challenge this finding on appeal.

Turning to the second element—the existence of a beneficial parent-child relationship—the juvenile court must "consider the evidence showing whether the parent's actions or inactions 'continued or developed a *significant, positive, emotional attachment* from child to parent.' " (*In re B.D., supra*, 66 Cal.App.5th at p. 1230, italics added.) To determine whether the parent has established this element, courts consider factors including the age of the child, the amount of time the child spent in the parent's custody, the positive or negative effect of interaction between the parent and child, and the child's needs. (*Caden C., supra*, 11 Cal.5th at p. 632.) The court should also examine "how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)

Father contends the juvenile court relied on "erroneous facts unsupported by the record" in finding he failed to establish the second element. He takes issue with the court's comment that Child "doesn't ask about him or doesn't ask about more interaction with him, and [Child] does not express a desire to see him outside of those calls." Father points to the initial section 366.26 report, which stated Child liked to have phone calls with Father and would be sad to not see Father again. However, what Child actually said when asked how Child would feel if Child did not see Father,

6

was, " 'I don't know.  Probably sad.' "  The same report also indicated Child "does not ask about [Father] in between visits" and "will not want to talk to" Father if Child "is busy doing something at the time."

Father also points to evidence that Child enjoyed having in-person visits with Father and would have been comfortable with unsupervised visits during the 12-month review period.  By the time of the section 366.26 hearing, however, they had not had an in-person visit for over nine months— since Child moved to Nevada—and as the court recognized, Child had spent the last two years out of parents' care and was in Mother's care prior to that.

Finally, Father relies on minor's counsel's statement at the section 366.26 hearing that Child wanted to see him, looked forward to seeing him, and wanted him to visit in person.  But minor's counsel also explained that Father continuously declined the Agency's offers to assist with transportation, although he promised Child he would visit each time they talked, which is hard for someone of Child's age.  Indeed, the Agency reported Child did not like to talk to Father as often due to his "making promises of unsupervised visits during the telephone calls."

Father and Child had 12 telephone visits during the permanency planning reporting period, nine of which lasted three minutes or less, and three lasted seven minutes or less.  In his reply, Father criticizes the Agency for focusing on the length of the calls, contending almost every eight-year-old would prefer visitation in person over a phone call.  While that may be true, the brevity of the calls is nonetheless indicative of Child's lack of attachment to Father.

The court recognized that Child enjoyed calls with Father and that interaction between a child and parent will always have some incidental benefit to the child but explained that is not enough.  (See *In re Dakota H.*

7

(2005) 132 Cal.App.4th 212, 229 [the parent must demonstrate "more than incidental benefit to the child" and "more than frequent and loving contact, an emotional bond with the child, or pleasant visits"].) The court weighed the evidence in finding that Child did not have a significant, positive, emotional attachment to Father. Father urges a different interpretation of the record but it is not our place to reweigh the evidence. (*Caden C., supra*, 11 Cal.5th at p. 640, citations omitted.) We must affirm the lower court's finding if supported by substantial evidence even though other evidence may support a different result. (*Ibid.*)

The third element of the beneficial parent-child relationship exception requires the juvenile court to determine whether terminating the parental relationship would be detrimental to the child. (*Caden C., supra*, 11 Cal.5th at p. 633.) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632.) This requires the juvenile court to determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) The juvenile court must then weigh the loss of this relationship with "the benefit of placement in a new, adoptive home . . . ." (*Ibid.*)

Father contends the court's conclusion that severing Child's relationship with him would not be detrimental to Child lacked analysis. Specifically, he claims the court improperly focused on the suitability of the current placement and did not determine whether termination of his parental rights would be detrimental to Child. The juvenile court found, however, that Child did not have a substantial, positive, emotional attachment to Father,

8

and we have concluded there is substantial evidence to support this finding. While this finding addresses the second element, the second and third elements of the exception "significantly overlap." (*Katherine J., supra*, 75 Cal.App.5th at p. 317, fn. 7.) "For example, evidence that terminating the parental relation would cause harm indicates that the child would lose important relational benefits if severed from [the] parent." (*Ibid.*) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C., supra*, 11 Cal.5th at pp. 633–634.) Here, because Child did not have a substantial, positive, emotional attachment to Father, there was no such beneficial relationship between them.

Nonetheless, contrary to Father's claim, the court did not issue a "conclusory statement" that the benefits of adoption outweighed the harm of terminating his parental rights. The court again acknowledged that terminating parental rights would likely have a life-long impact on Child in different ways at different times throughout life, but on balance when considering the benefits of adoption, the court concluded terminating the relationship would not be detrimental to Child—i.e., any harm from terminating the relationship did not outweigh the benefits of adoption. (*Caden C., supra*, 11 Cal.5th at p. 633.) The court was not required to recite its grounds, reasons, or specific findings regarding any of the three elements in determining that the parent-child relationship exception did not apply. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) We must affirm the court's determination unless it was arbitrary, capricious, or patently absurd. (*Caden C.*, at p. 641.) We cannot say that it was. Accordingly, the court did

9

not abuse its discretion when it declined to apply the beneficial parent-child relationship exception to adoption and terminated Father's parental rights.

## DISPOSITION

The order terminating parental rights is affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

KELETY, J.

10