Filed 1/23/25  In re M.D. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re M.D., a Person Coming Under the Juvenile Court Law. | D084697 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ4797) |
| v. | |
| B.D., | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Mark T. Cumba, Judge.  Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel and J. Jeffrey Bitticks, Deputy County Counsel, for Plaintiff and Respondent.

B.D. (Father) appeals a juvenile court's order terminating his parental rights to his child, M.D. (Child), under Welfare and Institutions Code section 366.26. He contends the court should have applied the beneficial parent-child relationship exception to adoption, under section 366.26(c)(1)(B)(i). We disagree and affirm the order terminating parental rights.

I.

In August 2022, the San Diego County Health and Human Services Agency filed a petition under section 300(b)(1), alleging then 10-month-old Child was exposed to a violent confrontation between Father and Child's mother (Mother) in the family home. The Agency reported that Father and Mother had a history of domestic violence, failed to comply with a safety plan, and declined to separate for Child's safety. The court detained Child in a foster home and ordered liberal supervised visits. Child was placed with a caregiver about a week later. The court subsequently sustained the petition, ordering reunification services for Mother and Father.

Father had his first visit with Child in October 2022. He was appropriate with Child, who cried at first but eventually appeared to recognize him. By the end of the visit, Child was getting comfortable with Father, would smile and babble with him, but still avoided eye contact. Father continued visits in-person, by phone, and by video. The in-person visits occurred weekly, facilitated by the caregiver. Child engaged positively with Father and always appeared happy to see him. The Agency reported it was clear Child and Father were bonded. Father, however, did not engage in services and his visits remained supervised throughout the case. Father did not visit Child between July and September 2023, as he reportedly moved out of the state during that time.

2

Mother was found deceased shortly after the court terminated reunification services in October 2023.

During the permanency planning phase, Father continued weekly in-person visits with Child. The caregiver reported Child would "have a reaction and become upset" if they drove by but did not stop at the park where Father's visits with Child occurred. During visits, Child typically stayed with Father the entire time. Father helped Child around the playground, pushed Child on the swings, and encouraged Child when Child had a difficult time doing things like climbing up steps. Child called Father "'Dad,'" held his hand at times, wanted his attention if he was talking to the caregiver or social worker, and would immediately go to him for comfort after falling or getting hurt. At the end of visits, Father would say "'[g]oodbye'" with a kiss and a hug, and Child would respond "'[b]ye Dad,'" while smiling. Child did not show signs of emotional distress upon separating from Father.

Child remained with the same caregiver since removal in August 2022. Child was thriving in the caregiver's home, enjoyed playing and dancing with the other foster children in the home, and was healthy. At around one year old, a developmental screening identified concerns for communication, personal skills, eating, and sleeping. Child was connected to all recommended services, including infant education, occupational therapy, and speech therapy. Child received behavioral services to address concerns regarding interaction with others but stopped these sessions after meeting treatment goals. Child also made progress in all areas of development. The caregiver continued to meet Child's immediate and ongoing needs, loved Child as her own, proved herself capable of providing Child with a safe and nurturing home, and was committed to providing Child stability through adoption. The Agency reported Child and the caregiver were very bonded.

At the section 366.26 hearing, Father's counsel argued for the beneficial parent-child relationship exception to adoption based on the "clear and strong" bond between Father and Child. The court found Father maintained consistent visitation and contact, but found there was no substantial, positive, emotional attachment from Child to Father. Even if there was that attachment, the court determined the detriment to Child that may arise from terminating the relationship was outweighed by the benefit of a new, stable, and secure adoptive home. The court thus concluded the beneficial parent-child relationship exception did not apply, terminated parental rights, and selected adoption as Child's permanent plan.

## II.

Father contends the juvenile court erred in declining to apply the beneficial parent-child relationship exception. We disagree. Substantial evidence supports the court's finding that Child did not have a substantial, positive, emotional attachment to Father, and the court was within its discretion in concluding that any detriment in terminating the relationship was outweighed by the benefits of a new adoptive home.

"After reunification services have terminated, the focus of a dependency proceeding shifts from family preservation to promoting the best interest of the child including the child's interest in a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child." (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534 [cleaned up].) At a permanency plan hearing, the juvenile court may order one of three alternatives: terminate parental rights and order adoption, appoint a legal guardian, or place the child in long-term foster care. (*Ibid.*) If the child is adoptable, there is a strong preference for adoption over the alternative permanency plans. (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.)

4

Once the court finds the child is adoptable, the burden shifts to the parent to demonstrate that a statutory exception applies. (*Id.* at p. 1225; § 366.26(c)(1).) If the parent does not establish the applicability of a statutory exception, the court must terminate parental rights. (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316.)

One exception is when a beneficial parent-child relationship exists. (§ 366.26(c)(1)(B)(i).) It applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid.*) The exception requires the parent to prove: "(1) regular visitation and contact, taking into account the extent of visitation permitted; (2) a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and (3) a showing that terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re M.G.* (2022) 80 Cal.App.5th 836, 847.)

"We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parental relationship, for substantial evidence." (*In re B.D.,* 66 Cal.App.5th at p. 1225, citing *In re Caden C.* (2021) 11 Cal.5th 614, 639–640.) We do "'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts'" and will not disturb the court's findings even where substantial evidence to the contrary also exists. (*Caden C.,* at p. 640.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [the] parent—is discretionary and properly reviewed for abuse of discretion."

5

(*Ibid.*)  A court abuses its discretion "by making an arbitrary, capricious, or patently absurd determination." (*Id.* at p. 641 [cleaned up].)

Here, the juvenile court found Father satisfied the first element of regular visitation and contact with Child.  The Agency argues this finding is not supported by substantial evidence.  Because Father did not satisfy the second and third elements, we need not address the sufficiency of the evidence to support this first element.

Turning to the second element—the existence of a beneficial parent-child relationship—the juvenile court must "consider the evidence showing whether the parent's actions or inactions 'continued or developed a *significant, positive, emotional attachment* from child to parent.'" (*In re B.D.,* 66 Cal.App.5th at p. 1230, italics added.)  To determine whether the parent has established this element, courts consider factors including the age of the child, the amount of time the child spent in the parent's custody, the positive or negative effect of interaction between the parent and child, and the child's needs. (*Caden C.,* 11 Cal.5th at p. 632.)  The court should also examine "how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)  To meet the burden of proof, the parent must demonstrate "*more than* frequent and loving contact, an emotional bond with the child, or pleasant visits." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229, italics added.)

Father argues the record shows he and Child had a positive relationship, which Child would benefit from continuing.  He points to the many descriptions of positive interactions between them during visits.  Even if other evidence may support a different result, we must affirm the juvenile court's finding if supported by substantial evidence. (*Caden C.,* 11 Cal.5th at p. 640.)  That includes evidence Child, who was almost three years old at the time of the section 366.26 hearing, had spent only the first 10 months of life

6

in Father's care. While the record shows the visits were positive, the reports also state Child did not show signs of emotional distress upon separation from Father and transitioned back to the caregiver with no concerns. The juvenile court weighed this evidence in finding that Child's relationship with Father reflected a friendly relationship or one with a loving extended family member rather than a significant, positive, emotional attachment. It is not our role to reweigh the evidence. (*Caden C.*, 11 Cal.5th at p. 640.)

The third element of the beneficial parent-child relationship exception requires the juvenile court to determine whether terminating the parental relationship would be detrimental to the child. (*Caden C.,* 11 Cal.5th at p. 633.) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632.) This requires the court to determine "how" the loss of the relationship will affect the child, "in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) The court must then weigh the loss of this relationship with "the benefit of placement in a new, adoptive home[.]" (*Ibid.*)

Father argues terminating his relationship with Child would be detrimental to Child based on evidence that they were bonded and had a close relationship. Specifically, during visits, Child looked to Father for support, help, and validation. Child also sought Father's attention and would go to Father for comfort after falling or getting hurt. Father urges the fact that Child gets upset passing by the park without stopping for a visit demonstrates Child's longing for him and how Child would be affected by losing that relationship. Indeed, the court acknowledged there were possible negative effects.

Father focuses on some positive aspects of his relationship with Child but does not address the benefits of adoption. Child was in a secure and stable placement with the same caregiver since removal at 10 months old. Child was thriving, making progress in all areas of development, and accomplished behavioral services goals. The caregiver consistently met Child's physical, developmental, and emotional needs, and was dedicated to providing Child with a nurturing home. Having spent two years there, Child was bonded with the caregiver, who was committed to providing permanency and stability through adoption.

When reunification services have been terminated, the focus shifts from family preservation to promoting the child's best interest, including the child's interest in a stable, permanent home. (*Fernando M.*, 138 Cal.App.4th at p. 534.) On balance, when considering the benefits of adoption, the juvenile court concluded that terminating the relationship with Father would not be detrimental to Child—i.e., any harm from terminating the relationship was outweighed by the benefits of adoption. (*Caden C.*, 11 Cal.5th at p. 633.) We must affirm the court's determination unless it was arbitrary, capricious, or patently absurd. (*Id.* at p. 641.) We cannot conclude it was.

## III.

We affirm the order terminating parental rights.


CASTILLO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


KELETY, J.

8