Filed 4/21/26  Marriage of S.R. and A.T. CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of S.R. and A.T. | H052578<br>(Santa Clara County<br>Super. Ct. No. 21FL001225) |
| S.R.,<br><br>        Respondent,<br><br>v.<br><br>A.T.,<br><br>        Appellant. | |

Appellant A.T. and Respondent S.R. married in 2017, had a son (R.R.) in 2018, and divorced in 2022.[1]  In May 2024, S.R. sought a domestic violence restraining order (DVRO) against A.T. pursuant to the Domestic Violence Prevention Act (DVPA, Fam. Code, § 6200, et seq.)[2] to protect herself, R.R., and S.R.'s new husband (N.D.).  In her DVRO application, S.R. alleged that A.T. disturbed her peace in numerous ways.  Following two days of trial in July 2024, the trial court granted S.R.'s request and issued a DVRO protecting S.R. only.

---

[1] To protect the privacy of parties sought to be protected by the domestic violence restraining order in this case, we refer to them by their initials.  (See Cal. Rules of Court, rule 8.90(b)(1).)

[2] All statutory references are to the Family Code unless otherwise stated.

A.T. appeals the DVRO, arguing the trial court abused its discretion because the evidence, considered under the totality of the circumstances, did not support issuance of the order. We see no abuse of discretion in the trial court's decision to grant the DVRO and affirm.[3]

## I.      BACKGROUND

### A.      Marriage, Dissolution, and Filing of DVRO Application

A.T. and S.R. were married in April 2017. They separated in September 2020 and their marriage was formally dissolved in October 2022. A.T. and S.R. are the parents of R.R., who was born in 2018.

Following their divorce, the parties shared legal and physical custody of R.R. S.R. resided with her new husband, N.D., in San Jose, and A.T. lived approximately 40 miles away in Livermore. S.R. and A.T. agreed that they had numerous conflicts concerning the upbringing of R.R.

On May 28, 2024, S.R. filed a DVRO request against A.T. to protect her, R.R., and N.D. S.R. alleged that A.T. sent her harassing text messages and emails, stalked her, made uninvited visits to her home, and left inappropriate items at her doorstep. The trial court issued a temporary DVRO protecting S.R., N.D., and R.R. The matter was eventually set for a one-day trial conducted over the course of two days in July 2024.

### B.      Evidence Presented at DVRO Trial

At trial, S.R. presented two witnesses: N.D. and herself. A.T. presented two witnesses: himself and Robert Enriquez, a non-professional visitation supervisor. The court admitted the parties' exhibits, including the declarations of S.R. and N.D. in support of S.R.'s DVRO request, text messages and emails between the parties, video recordings,

---

[3] A.T.'s opening brief also challenged the trial court's interim custody rulings under section 3044. In response to our request for supplemental briefing as to whether we have jurisdiction to review the trial court's temporary custody orders, A.T. now concedes his custody-related challenges are moot.

photographs, images, and documents relating to custody issues involving R.R. Both sides were represented by counsel.

We focus below on the evidence presented at trial concerning the incidents highlighted in the trial court's oral order granting the DVRO that A.T. contends were insufficient to establish a disturbance of S.R.'s peace.

1. *Palm Springs Incident*

S.R. testified she and N.D. had planned a vacation to Palm Springs on the weekend of May 17, 2024. She did not inform R.R. or A.T. of her vacation plans, and neither did N.D. However, on May 17, A.T. sent a text message to S.R. while she was traveling in which he said, "Enjoy your escape to the desert." S.R. was "[i]ncredibly alarmed" by this message and pulled the car over, turned off the location services on her phone, and did "a brief check around the car to see if there was any tracking device." S.R. testified that, throughout the weekend, she received two more messages from A.T. of a similar nature, including one that specifically identified Palm Springs.

During that same weekend, after the parties exchanged disagreements related to R.R., S.R. asked A.T. to stop texting her. In response, A.T. sent her 78 messages which were all pictures of R.R. in a matter of a few minutes. S.R. stated, "it felt very harassing, like he was poking at the idea and then he can do it anyway." She further testified that, "these events kind of just took over our relaxing weekend and made it more about a reminder that [A.T.] is always going to be putting himself in our business somehow."

A.T. testified that he learned about S.R.'s Palm Springs trip from the parents of one of R.R.'s friends. He denied ever tracking S.R.'s location. As to the 78 text messages, A.T. testified he sent the pictures because S.R. had deleted their joint photo album and he wanted to share those pictures with her. A.T. acknowledged that S.R. had asked him to stop but he testified that, once he had sent the pictures as "one data transfer," he was unaware of "any undo button" to stop the transfers.

3

2.    *Bullet Incident*

On May 31, 2024, after the court issued the temporary DVRO but before A.T. was served with the orders, A.T. went to S.R.'s home uninvited and rang the doorbell. N.D. was alone at home. Using their doorbell camera's speaker, N.D. asked A.T. multiple times to leave, but A.T. refused, stating he was there to exercise his visitation rights with R.R. A.T. told N.D., through the doorbell camera, that N.D. could involve law enforcement if he desired but A.T. was not leaving. N.D. then contacted law enforcement.

While waiting for law enforcement to arrive, N.D. claimed that A.T. "began wandering on our property, circling around my vehicle, walking up and down the sidewalk, and attempting to look into our backyard. [A.T.] also continuously pressed our . . . doorbell as a method of harassment." N.D. also testified that, in a video captured on their doorbell camera, he saw A.T. "messing with something in his pocket, hands and then went down to pick something up and a statement that was heard was 'Whoa, a bullet.' " N.D. claimed that after A.T. picked up the bullet from the ground, he "stared intimidatingly into our . . . doorbell camera for approximately two seconds, which was clearly an attempt to intimidate me." Law enforcement arrived thereafter and served A.T. with the temporary DVRO, at which point A.T. left their home.

N.D. testified that S.R. also watched this video, and her demeanor reflected concern after she viewed it. S.R. testified that she felt "[e]xtremely confused as to why a bullet would be in someone's pocket or why they would make that known knowing they're being recorded on the [home's] camera video." She believed A.T.'s conduct in that video was "an intimidation tactic."

A.T. testified that he did not have a bullet in his pocket when he visited S.R.'s home; rather, he had a "spent shell casing" from Memorial Day weekend. He had picked up the shell casing "to show [R.R.]." A.T. testified that the clothes he was wearing in the

4

May 31 video was "the same outfit" he wears "all the time," and that the cargo pants he was wearing on Friday, May 31 was the same pair of pants he had been wearing earlier that week on Monday over Memorial Day weekend when he found the shell casing. A.T. said he would not "bring ammunition to [S.R.'s] home in order to scare her." A.T. said he does not have, and never has had, a gun.

3. *"Skibidi Toilet" Drawings*

S.R. testified that she and A.T. had a long-standing dispute over R.R. being exposed to "horror characters." One example of such objectionable imagery are cartoon characters from the "Skibidi Toilet" animated website series. S.R. did not want R.R. exposed to such characters because they scared him, in her view. A.T. knew that exposing these characters to R.R. were upsetting to S.R.

On May 17, 2024, while S.R. and N.D. were away for the weekend in Palm Springs, A.T. came to S.R.'s front porch and left a bag containing R.R.'s belongings, diapers, and a letter written by him and R.R. congratulating S.R. on her pregnancy.

S.R. described her reaction to the items A.T. left as follows: "When we came home, we found the package was an unwanted gift. It came with a bag of some of [R.R.]'s clothing items. That could have been dropped off in his backpack at the next handoff. And then the bag of diapers was to me a message of, again, like, you're never going to – he's always going to be around, making sure that I know that he's going to harass and taunt my family no matter what we do or what's in place. [¶] And the letter I think was the most threatening part. . . . [¶] And then there was a promise for more of these things which, again, felt like a reminder of he is always going to be doing something to kind of hold the emotional part of our life in a negative."

The letter from A.T. also contained a Skibidi Toilet drawing. Seeing this drawing made S.R. upset. She testified that "the letter I think was the most threatening part, . . . . It was all the characters that I've asked him multiple times to stop, you know, exposing

[R.R.] to, to stop putting on my items. This wasn't the first time." S.R. felt A.T.'s conduct was "like a psychological game . . . that's never going to end despite how much you speak up for yourself or . . . requesting something to stop. It just keeps happening."

S.R. also testified that A.T.'s knowledge of her pregnancy was "frustrating" as she had never informed him about it, and it was another example of A.T. "following our time line [*sic*] of our life and keeping track of us." She stated, "It just felt like he's going to keep watching us forever and we're never going to escape the mind games of this person." His conduct led to her "overall fear and living in the fear of what's going to happen next."

A.T., for his part, testified that writing notes and giving drawings is something he has "always done with all of [his] friends." A.T. stated he did not intend the letter to cause any issues; he and R.R. were simply excited for S.R.'s pregnancy.

4.     *Visits by A.T. to S.R.'s House*

In her declaration, S.R. claimed that A.T. had made multiple uninvited visits to her home since April 2024, including the two incidents on May 17 and May 31 described above, despite "repeated requests that [A.T.] stay off my property." S.R. alleged that A.T. was jealous of her relationship with N.D. and that A.T. had no reason to visit her home with N.D. or to leave items there. She stated that his refusal to comply with her request to stay away was "incredibly distressing," and his "repeated presence" at her home caused her to be fearful for the safety of herself and her family.

At trial, S.R. testified that A.T.'s uninvited visits worried her and made her "live on edge in fear of, you know, what's going to happen next." N.D. testified that S.R. "seemed frightened and felt like – [she] had to prepare for any worst case scenario that was about to happen."

A.T. testified that he went to S.R.'s home to drop off R.R.'s belongings, which S.R. wanted him to return. He did not believe that going to S.R.'s house on May 17 to

6

drop off items on her front porch was prohibited; in fact, he thought S.R. wanted him to do so. A.T. also explained he dropped R.R.'s belongings at S.R.'s home because "she has a camera there" and thus there would be documentary evidence showing he had returned the items.

As for his May 31 visit to S.R.'s house, A.T. testified that he was at S.R.'s house because it was his custodial day with R.R. S.R. and N.D. agreed that May 31 normally would have been A.T.'s custodial day, but for the temporary DVRO which had not yet been served on A.T. that prohibited all visitation between A.T. and R.R. at that time.

## C. Trial Court Orders Following Trial

### 1. *DVRO*

After receiving evidence and hearing argument, the trial court set a hearing date of August 19, 2024 to announce its decision. On August 19, the court granted S.R.'s request for a DVRO, finding that she "presented by a preponderance of the evidence instances [by A.T.] that disturbed [her]." The court also stated that A.T. "lack[ed] some insight into the behaviors that led [the parties] to this point." The trial court then discussed its view of the above-mentioned incidents.

For the Palm Springs trip, the court told A.T. that: "I do believe that the way that you communicated to [S.R.] that you were aware that she was out of town and that you were aware that she was in the desert without telling her how you learned that information . . . you intended it to appear [] that you had some confidential or semi-confidential information that she didn't give to you that you obtained somehow. And that ambiguity is what gives rise to the fear of" whether A.T. was tracking or stalking S.R. The court found it was "reasonable for a person to harbor some anxiety and fear around [A.T.'s messages] whether or not things have escalated to the point where [he was]. . . tracking or stalking her and the Court did weigh that heavily as an issue that disturbed the peace of [S.R.]."

7

With regard to the bullet incident, the court found it "particularly concerning. The court specifically found A.T.'s explanation for why the shell casing was in his pocket and fell out of his pocket in view of the front doorbell's camera was not credible. The court noted that it "legitimately raises the question as to whether or not things are escalating from imitation to reality and that reasonably induces fear. It really reasonably makes someone feel scared." The court found that A.T. was "somewhat aware" that such conduct would induce fear.

For the Skibidi Toilet drawing in the letter left on S.R.'s doorstep on May 17, the court stated that A.T. "knew that in [sending S.R. images of these characters] it was frustrating and upsetting" to her, and this was "some harassment."

Finally, with regard to A.T.'s visits to S.R.'s house, the court noted that "[t]here was no express indication that [A.T. was] not permitted to be" at the house." But then the court told A.T. that "it's important that a lot of the things that you – a lot of the problematic behavior that you engaged in happened at the home. It is a particularly sensitive and vulnerable location and certainly that gives context to the issues here." The court found that, with respect to the incidents, A.T. knew that his conduct was "upsetting [S.R.] and [he] continued to engage" in such conduct because he "didn't think it was reasonable for [S.R.] to be upset." His conduct, the court found, was "harassing and it led to a point where . . . [S.R.]'s peace has been disturbed."

The trial court then issued the DVRO against A.T. with S.R. as the protected party, but limited the DVRO to one year, noting that one year likely was enough of a "cooling off period." The trial court then found that A.T.'s actions were not aimed at R.R. or N.D., and therefore did not include R.R. and N.D. as protected parties in the DVRO.

The court filed the formal DVRO on September 9, 2024. A.T. timely appealed.

8

## II.    DISCUSSION[4]

### A.    Legal Standard

The purpose of the DVPA "is to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.)  Accordingly, a trial court may issue a DVRO if a preponderance of the evidence "shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (§ 6300, subd. (a).)

Under the DVPA, "abuse" includes, but "is not limited to[,] the actual infliction of physical injury or assault." (§ 6203, subd. (b).)  As relevant here, the term is defined as including "engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320." (*Id.*, subd. (a).)  In turn, section 6320 states that a court may enjoin a party from "threatening, sexually assaulting, . . . harassing, . . . or disturbing the peace of the other party." (§ 6320, subd. (a).)  The phrase " 'disturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (*Id.*, subd. (c).)  A disturbance of someone's peace does not require "profanity," "shouting," or explicit "threats." (*McCord v. Smith* (2020) 51 Cal.App.5th 358, 365 (*McCord*) [ex-boyfriend's uninvited visits and repeated attempts to initiate contact after their breakup disturbed the victim's peace].)  There is no requirement that the offending party intend to disturb the peace of the other party before a DVRO can issue (see *Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th

---

[4] The DVRO at issue expired on August 19, 2025.  This fact would generally render the appeal moot and, hence, subject to dismissal. (*City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1079 [appeal from expired injunction order was moot].)  We requested and received supplemental briefing from the parties on this issue.  We agree with the parties that the appeal is not moot because the DVRO imposes legal consequences for A.T. in future custody proceedings. (*Cardona v. Soto* (2024) 105 Cal.App.5th 141, 149.)  Accordingly, we proceed on the merits of A.T.'s appeal.

9

389, 399 (*Perez*)); it is enough if, based on the totality of the circumstances, the other party's mental or emotional calm has been destroyed by the offending party.  (§ 6320, subd. (c).)

We review an order granting a DVRO for an abuse of discretion.  (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 115 (*F.M.*).)  The discretion to issue a DVRO is "not unfettered"; if the trial court misunderstands the applicable law or is unaware of the full scope of its legal discretion, "the court has not properly exercised its discretion under the law."  (*Id*. at p. 116.)

We review the trial court's underlying factual findings for substantial evidence.  (*F.M.*, *supra*, 65 Cal.App.5th at p. 116.)  Substantial evidence is " ' " 'evidence that is reasonable, credible, and of solid value.' " ' [Citation.]"  (*People v. Ramirez* (2022) 13 Cal.5th 997, 1117-1118.)  In determining whether there is such evidence, we review the record "in the light most favorable to the prevailing party, resolve all conflicts in the evidence in favor of the ruling or judgment being reviewed, and indulge all reasonable inferences" in support of the trial court's findings.  (*Schneer v. Llaurado* (2015) 242 Cal.App.4th 1276, 1286-1287.)  Under the substantial evidence standard, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' "  (*In re Caden C.* (2021) 11 Cal.5th 614, 640, quoting *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)  "If two or more reasonable inferences can be reasonably deduced from the facts, we have no authority as a reviewing court to substitute our judgment for the trial court's judgment."  (*McCord*, *supra*, 51 Cal.App.5th at p. 364.)

As the appellant, A.T. must demonstrate that the challenged rulings were erroneous to obtain relief.  "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness."  (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)  In particular,

10

a trial court's "[c]redibility determinations . . . are subject to extremely deferential review." (*Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 579 (*Jennifer K.*).)

## B.    DVRO

A.T. argues that there is no substantial evidence to support the DVRO issued against him. As explained below, we disagree.

### 1.    *Palm Springs Incident*

The trial court found that A.T.'s May 17 text to S.R. showing he was aware of her Palm Springs vacation without disclosing how he obtained that information made S.R. reasonably believe that A.T. had tracked S.R.'s movements, and thus this text disturbed her peace. A.T. contends there was no reasonable basis for the trial court's conclusion because there was no evidence he intended to disturb S.R.'s peace, given that S.R. never asked how he knew about her trip. Nor, he argues, was there evidence that his text message disturbed S.R.'s peace, as she never responded to indicate that his knowledge of her trip caused her concern.

As the trial court found, A.T.'s ambiguous message to "[e]njoy your escape to the desert" was intended to induce anxiety and fear in S.R., and, as S.R. testified at trial, in fact had that effect. That S.R. did not respond to his message—either to ask how A.T. knew about her trip or to state her concern—does not negate the substantial evidence supporting the trial court's findings. It was undisputed that S.R. had not informed A.T. or R.R. about her and N.D.'s vacation to Palm Springs. A.T. sent the first of such messages on the very day S.R. departed for Palm Springs, permitting a reasonable inference that he intended her to know he was aware of her specific movements. He continued sending similar messages throughout her vacation, serving no purpose other than to repeatedly convey that he was aware of her whereabouts.

Accordingly, substantial evidence supports the trial court's findings; that the evidence might also support a different conclusion is immaterial to our review. (*In re*

11

*Marriage of Ankola* (2020) 53 Cal.App.5th 369, 380.) And as stated above, if the effect of the offending party's action, under the totality of the circumstances, is to disturb another's peace, a DVRO can issue even if the offending party didn't intend to cause that disturbance. (See *Perez, supra,* 1 Cal.App.5th at p. 399.)

2.    *Bullet Incident*

As to the May 31 visit to S.R.'s home, A.T. denied having the bullet in his pocket (or pulling it out of his pocket) on purpose. But the trial court did not believe his explanation: "The issue of the bullet was particularly concerning to the Court. I did not find credible your explanation that – as to why you would have had a shell casing in your pocket for a week without being aware of it, and that the only time that it accidentally presented itself happened to be when you were on the [S.R.]'s porch." A.T. thus asks us to reassess witness credibility. But we generally defer to a trial court's assessment of credibility, as " ' "[w]e have no power on appeal to judge the credibility of witnesses or to reweigh the evidence." ' [Citations.]" (*Jennifer K., supra,* 47 Cal.App.5th at p. 579.)

Here, substantial evidence supports the trial court's conclusion that this incident disturbed S.R.'s peace. A.T. refused to leave S.R.'s home despite N.D.'s repeated requests that he do so and repeatedly rang the doorbell. When his efforts went unanswered, A.T. dropped a shell casing in direct view of S.R.'s doorbell camera, made the statement "Whoa, a bullet" loud enough for the audio to be captured by camera, and then stared into the doorbell camera. A.T. does not dispute these facts. S.R. testified that A.T.'s uninvited visits to her home, including the May 31 visit, worried her and made her "live on edge in fear of, you know, what's going to happen next." That A.T. offered a different explanation for his conduct—an explanation the trial court expressly rejected— does not undermine the uncontroverted evidence of his actions that day or the substantial evidence supporting the court's finding that his conduct disturbed S.R.'s peace.

### 3. *Skibidi Toilet Characters*

A.T. knew that S.R. didn't want him to expose or discuss the Skibidi Toilet characters with R.R. Despite this knowledge, A.T. left a letter for S.R. on May 17 that contained drawings of these characters. S.R. testified how this drawing upset her because she thought it was "threatening." That is sufficient evidence for the trial court to find, as it did, that this incident disturbed S.R.'s peace. The trial court stated it did not "think [it] received a better alternative explanation [as to why these drawings were given to S.R.] other than what appeared to be some harassment."

A.T. argues that he had no intent to disturb S.R.'s peace with the letter, but simply was excited for S.R.'s new baby. As discussed above, however, an intent to disturb someone else's peace is not required under the DVPA for a court to find that one's peace has, in fact, been disturbed. The trial court implicitly rejected A.T.'s supposedly "better alternative explanation," and we see no reason to disturb the trial court's determination.

### 4. *Visits to S.R.'s House*

A.T. contends the trial court based its ruling solely on the location of his conduct (i.e., S.R.'s home) which he asserts he visited for legitimate purposes, and that there was no evidence his visits disturbed or destroyed her mental calm.

The trial court did not grant the DVRO based solely on the location of his conduct. The trial court simply noted that much of A.T.'s "problematic behavior"—such as leaving the letter with the Skibidi Toilet drawings and the bullet incident—occurred at or in front of S.R.'s house. The court, however, also evaluated his conduct under the totality of the circumstances and found that A.T. continued engaging in behavior he knew was upsetting to S.R. Although A.T. had not been expressly prohibited from being at S.R.'s home, the court nevertheless found that his conduct disturbed her peace. Substantial evidence supports that finding. The evidence showed the diapers A.T. left at S.R.'s doorstep on May 17 were unwanted and alarming, particularly because S.R. had not

13

disclosed her pregnancy to him. The letter he left containing drawings she found offensive was likewise a continuing course of his harassment. It was undisputed that when A.T. came to S.R.'s home on May 31 and was repeatedly asked by N.D. to leave, he refused, continued ringing the doorbell, and staged a display in front of the doorbell camera suggesting he possessed a bullet.

Citing a portion of S.R.'s trial testimony, A.T. contends S.R. only testified she was "curious" and "stressed" by his conduct, which is insufficient to establish abuse under the DVPA. His contentions are not supported by the record. S.R. testified that A.T.'s conduct led her to live in fear, to feel constantly watched and harassed, and that she would never be able to escape or stop his "psychological game."

We hence are not persuaded by A.T.'s contention and conclude that substantial evidence supports the trial court's determination that A.T.'s conduct disturbed S.R.'s peace.

5. *Summary*

Substantial evidence supports the trial court's factual findings concerning the incidents discussed above. We find no abuse of discretion with the court's issuance of the DVRO. While A.T. has proffered alternate explanations for his conduct, the trial court had discretion to find them, as it did, non-credible or insufficient.

## IV. DISPOSITION

The DVRO entered after the September 9, 2024 hearing is affirmed.

14

KULKARNI, J.*

WE CONCUR:

GROVER, ACTING P. J.

DANNER, J.

*S.R. v. A.T.*
H052578

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.